UNITED STATES of America, Plaintiff,

v.

Matthew GRANGER, Scott A. Fountain, Randall D. Dahlin, Defendants.

No. 84–CR–24–C.

United States District Court, W.D. Wisconsin.

Sept. 17, 1984.

Asst. U.S. Atty. John Vaudreuil, Madison, Wis., for plaintiff.

Charles Kernats, Madison, Wis., for defendant Fountain.

Earl Munson, Madison, Wis., for defendant Granger.

Michael Jan Steckelis, Madison, Wis., for defendant Dahlin.

## ORDER

CRABB, Chief Judge.

On March 29, 1984, the government applied for a search warrant to obtain and test samples of the blood of Scott A. Fountain. Upon issuance of the warrant by the United States Magistrate, blood was drawn from defendant Fountain on March 30, 1984. Subsequently, in a two count indictment returned on April 20, 1984, Scott A. Fountain, Matthew D. Granger, and Randall D. Dahlin were charged with murder and conspiracy to murder Boyd Spikerman, an employee of the United States Bureau of Prisons, in violation of 18 U.S.C. §§ 1111 and 1114. Now defendant Fountain has moved to suppress results of any tests

performed with his blood on the ground that the search warrant granted to draw the blood sample was invalid.[1]

The parties agree that the Fourth Amendment prohibition against unreasonable searches and seizures is applicable to the drawing of blood for evidentiary purposes. *Schmerber v. California*, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966). However, they disagree about the reasonableness of the seizure of defendant's blood and about the consequences of a finding that the warrant was invalid. The government contends that even if the warrant is held to be invalid, the results of the blood test should not be suppressed because the officers executing the search warrant relied in good faith on its validity.

A copy of the challenged affidavit is attached as appendix A to this opinion. The essential elements are summarized below.

The affiant, Richard Staedtler, has been a special agent with the Federal Bureau of Investigation for fifteen years. He was told by Correctional Officer Gary Stammen that Stammen had found fellow correctional officer Boyd Spikerman lying in a large amount of blood in the officer's unit office of Juneau Cottage within the Federal Correctional Institution in Oxford, Wisconsin, at approximately 5:20 a.m. on January 29, 1984, about 25 minutes after Stammen had last spoken by telephone with Spikerman. At approximately 5:35 a.m. on the same day, Stammen had observed blood on the door knob of the Juneau Cottage cell assigned to defendants Granger and Fountain. Staedtler was told by a confidential informant that he had observed Scott Fountain, Randall Dahlin, and Matthew Granger hurrying from the area of the correctional officer's office in Juneau Cottage toward one of Juneau Cottage's housing wings sometime after 2:00 a.m. on January 29, 1984. The informant told Staedtler that defendant Fountain was wearing a blue

sweatshirt with a zipper down the front. During an investigation conducted later the same day, a blue, front zippered sweatshirt with blood on it was found in one of the bathroom stalls in Juneau Cottage.

Correctional Officer Jamison Zuehlke told Staedtler that he had found Spikerman lying with blood around his head at approximately 5:13 a.m. on January 29, 1984; that at the same time he had seen defendant Granger in the television viewing area of Juneau Cottage; that defendant Granger had approached Zuehlke saying, "I can't sleep. I heard them again. I tried to tell them I didn't mean to do it. Hurry, I can hear them again"; and that Zuehlke had ordered defendant Granger to lie on the floor, where he was handcuffed. While handcuffing defendant Granger, Zuehlke noticed blood and cuts on Granger's hands.

Agent Staedtler learned from Cathy Schupback, a registered nurse, that she had attended Spikerman at 5:45 a.m. on January 29, 1984; that Spikerman was dead when she arrived; and that she estimated the time of his death to be approximately 5:15 a.m.

Agent Staedtler stated that he believed the information he received from Stammen, Zuehlke, and Schupback was reliable because these persons were reporting what they had observed personally while performing their official duties and because the information was corroborated by other sources. Staedtler stated he believed the information he received from the confidential informant to be reliable because "it is corroborated by information I received from other sources."

After reviewing the averments of Staedtler's affidavit, the magistrate found probable cause for the search warrant and issued it on March 29, 1984. On March 30, 1984, approximately 12 cubic centimeters of blood were removed from defendant Fountain.

**1.** Defendant's original suppression motion was directed to suppression of fingerprints taken from him, the blood test results, physical evidence taken from his cell, statements defendant Fountain made to FBI agents and other investigators, and other physical evidence or statements obtained without a warrant or with legal counsel. Defendant has withdrawn all portions of the motion except that which relates to the suppression of the blood test.

## OPINION

The starting point for an evaluation of the sufficiency of an affidavit in support of a search warrant is *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), in which the United States Supreme Court clarified the standards for determining the reliability of confidentially-supplied information and for deciding whether there is probable cause to believe that contraband or evidence is located in a particular place. In the *Gates* case, a suburban police deputy had obtained a warrant to search the car and home of one Lance Gates and his wife, to look for contraband drugs. The warrant was based upon an affidavit setting forth the fact that the police had obtained from an anonymous letter and additional facts verified by a police deputy: that Lance Gates had reserved a place on a flight from Chicago to West Palm Beach, that he had boarded the flight, arrived in Florida, spent one night there and started to Illinois by car the next day, all in the manner described in the anonymous letter.

The Illinois Supreme Court concluded that, by itself, the anonymous letter did not provide the basis for a determination of probable cause and that the accompanying affidavit summarizing the corroborating information obtained by the police did not supply the missing indicia of reliability. Applying the two-pronged test derived from *Spinelli v. U.S.*, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969), the Illinois court analyzed the affidavit supporting the application for the search warrant to determine whether it revealed the letter writer's "basis of knowledge," as well as the reliability of the information or the veracity of the informant. The court found that the *Spinelli* test had not been satisfied, because there was nothing in the affidavit to indicate the letter writer's basis of knowledge and also because there was no basis for concluding that the informant was credible. The court suggested that corroboration of details might never be sufficient to meet the veracity prong of the test, but such corroboration was clearly insufficient when it concerned only innocent details.

In reversing the Illinois Supreme Court, the United States Supreme Court rejected the idea that veracity, reliability and basis of knowledge are to be evaluated as "entirely separate and independent requirements to be rigidly exacted in every case," *Illinois v. Gates*, 462 U.S. at ——, 103 S.Ct. at 2327–28. The Court held that if the affidavit includes reference to a confidential informant, reviewing courts are not to apply the two-pronged inquiry analyzing independently the basis of the informant's knowledge and his or her veracity, but instead are to consider those two factors in a "balanced assessment of the relative weights of all the various indicia of reliability (and unreliability) attending an informant's tip." *Id.* at ——, 103 S.Ct. at 2330. "An informant's 'veracity,' 'reliability,' and 'basis of knowledge' ... should be understood simply as closely intertwined issues that may usefully illuminate the common-sense, practical question whether there is 'probable cause' to believe that contraband or evidence is located in a particular place." *Id.* at —— ——, 103 S.Ct. at 2327–28.

 In evaluating the sufficiency of an affidavit, the magistrate is to

> make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.

*Id.* at ——, 103 S.Ct. at 2332. The court reviewing the magistrate's decision is not to undertake a *de novo* review, but should pay "great deference" to the magistrate's determination. The task of the reviewing court is to ensure simply that the magistrate " 'had a substantial basis for ... conclud[ing]' that probable cause existed." *Id.*, quoting *Jones v. United States*, 362 U.S. 257, 271, 80 S.Ct. 725, 736, 4 L.Ed.2d 697 (1960).

 Reviewing the sufficiency of the affidavit at issue here in the nontechnical manner directed by the Supreme Court, and giving due deference to the magis-

trate's decision, I conclude nonetheless that the magistrate did not have a substantial basis for concluding that evidence relevant to Spikerman's death would be found in defendant Fountain's blood.[2] Staedtler's affidavit does not provide a basis for finding that defendant Fountain was probably involved in the murder or that a test of his blood would be likely to produce evidence of his involvement.

In the affidavit, Staedtler says only that a confidential informant had said that he had seen defendant Fountain in defendant Granger's area of the officer's unit office sometime after 2:00 a.m. and that defendant Fountain had been wearing a blue, zippered sweatshirt; that a bloodied, blue, zippered sweatshirt was found later in a bathroom stall; and that blood was seen on the doorknob of the cell defendant Fountain shared with Granger.

Information supplied by a confidential informant cannot establish probable cause for a warrant unless there is some indication that the information is reliable. As the Supreme Court noted in *Illinois v. Gates,* 462 U.S. at ——, 103 S.Ct. at 2326, an anonymous tip that provides nothing from which one might conclude that the informant is honest or that his information is reliable or one that "gives absolutely no indication of the basis for [the informant's] predictions" does not provide a basis for a probable cause finding.

In the present case, the informant's statements are not simply without support; they are inherently suspect because of their source. As an inmate of Juneau Cottage, the informant must be considered to be under suspicion. From that standpoint alone, it would have been to his advantage to describe another inmate as having been seen in suspicious circumstances wearing a sweatshirt similar to the one that had been found with blood on it,[3] and if he himself was the owner and wearer of the blue sweatshirt, it would be particularly to his advantage to tell the FBI that he had seen defendant Fountain wearing it.

Since nothing in the informant's own statement provides an independent basis for concluding that he is credible or that his observation is reliable, some other indicia of reliability is required. The Supreme Court suggests that the additional information may be supplied through a statement by the affiant of the informant's proven reliability in other instances, or by a showing that the information supplied would subject the informant to criminal liability if it were proved to have been fabricated, or if the information is detailed and explicit and is accompanied by "a statement that the event was observed first-hand." *Illinois v. Gates,* at ——, 103 S.Ct. at 2330. Recognizing that none of the indicia suggested by the Supreme Court are present here, the government contends that the discovery of the bloody sweatshirt provides the necessary corroboration of the informant's observations. Clearly, it does not. The finding of a bloody sweatshirt matching the description of the one the informant reported seeing may corroborate the informant's statement that he saw someone wearing such a sweatshirt. But the affidavit is silent as to whether blue zippered sweatshirts are unique items of clothing within the institution or whether they are standard issue along with khaki shirts and slacks, whether defendant Fountain had been known to own such a sweatshirt and,

**2.** If the warrant were directed at defendant Granger, it would be more than adequate. The credible information in the affidavit shows that defendant Granger was in the immediate vicinity of the crime within minutes after the crime is thought to have been committed, that he was acting peculiarly, and that he had blood and cuts on the palms of his hands.

**3.** Although the affidavit does not state whether the informant's statement was obtained before the sweatshirt was found, common sense suggests it was not. The institution at Oxford is more than an hour's drive from the FBI offices in Madison and the crime occurred well before ordinary office hours. It is highly unlikely that Agent Staedtler would have been at the institution interviewing a confidential informant before the search of the scene had turned up an object as large as a sweatshirt. It is even more unlikely, given the nature of communication within the institution, that the discovery of the sweatshirt would not have been known immediately to every inmate within the institution.

if so, whether it was missing from his cell, or even whether the bloody sweatshirt was of a size that could fit defendant Fountain. Thus, it does not corroborate the informer in the sense that it provides the magistrate with independent evidence of the reliability of the informant's identification of defendant Fountain as the person wearing the sweatshirt, and it does nothing to rebut the possibility that it was the informant himself who wore the sweatshirt.

Alternatively, the government suggests that the discovery of the blood on the doorknob of defendant Fountain's cell supports the reliability of the confidential information or that it provides a basis for the issuance of the warrant in and of itself. The flaw in this suggestion is that the affidavit is silent as to where defendant Fountain was when the blood was discovered. Affiant Staedtler never says that defendant Fountain was found in his cell or near it. Without such a statement, it is pure speculation that it was defendant Fountain and not any other Juneau Cottage resident, including defendant Granger, who touched the doorknob in the twenty-minute period between Spikerman's death and the discovery of the blood on the doorknob. Since defendant Fountain's presence in or near the cell would have been so easy to ascertain, the omission of any information on this point seriously undermines any force the discovery of the blood would otherwise have had.

Although Staedtler makes a general, ambiguous averment in the affidavit that he believed the informant because his information was corroborated by information received from other sources, this statement does not supply the necessary indicia of reliability, however it is interpreted. If by "other information," Staedtler refers to the discovery of the sweatshirt, that discovery is no proof of the reliability of the identification of defendant Fountain, as I have pointed out above. If Staedtler is saying that he has received other information not described in the affidavit, his statement provides nothing that a magistrate can evaluate.

Finally, the affidavit is insufficient because Staedtler never sets forth facts from which the magistrate could have found probable cause to believe that defendant Fountain's blood would be of evidentiary value. Staedtler does not say that defendant Fountain had blood or cuts on him, so as to suggest that his blood might be on Spikerman or on the doorknob. Neither does he say that the circumstances of the death were such that it would have been likely that anyone involved would have been cut. The reader of the affidavit is left completely in the dark about the point of the search.

Because there is nothing in the affidavit to establish the reliability of the confidential informant, because the bloody doorknob is of so little significance in the absence of any indication that defendant Fountain had been near the doorknob, and because there is no explanation of the basis for the "search" of defendant Fountain's blood, I conclude that the magistrate did not have a substantial basis for concluding that there was probable cause to believe that evidence material to the murder of Boyd Spikerman would be discovered from a test of defendant Fountain's blood.

The next question is whether the FBI relied in objective good faith on the issuance of the warrant. This question arises as a consequence of the Supreme Court's decision in *U.S. v. Leon*, —— U.S. ——, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), in which the court held that imposition of the exclusionary sanction is a question separate from that of whether Fourth Amendment rights have been violated. If the law enforcement officer has relied upon the validity of a warrant issued by a magistrate and if the officer's reliance is objectively reasonable, "the marginal or nonexistent benefits produced by suppressing evidence ... cannot justify the substantial costs of exclusion." *Id.* —— U.S. at ——, 104 S.Ct. at 3421. Suppression remains an appropriate remedy in four situations: 1) if the affiant provides information he knows or should know is false; 2) if the magistrate wholly abandons his judicial role; 3) if

the affidavit is so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; or 4) if the warrant is so facially deficient that the executing officers cannot reasonably presume it to be valid. *Id.* at ——, 104 S.Ct. at 3421.

■ There is no contention in this case that the information in the affidavit was false, that the magistrate abandoned his judicial role in issuing the search warrant, or that the warrant was deficient on its face. The question of good faith is solely whether the affidavit was "so lacking in indicia of probable cause," that it was unreasonable for Agent Staedtler to rely upon it.

Analyzed in a commonsense, nonhypertechnical way, the affidavit does not supply anything more than the most tenuous and conclusory suggestion that defendant Fountain was even involved in the death of Spikerman, much less that his blood would reveal evidence of the crime. In my view, no reasonably well-trained law enforcement officer would have been justified in relying on the warrant, knowing, as Staedtler did, of the paucity of information in the affidavit presented to the magistrate.[4]

Unless the courts are to abandon entirely their obligation to review applications for search warrants and the concomitant responsibility to try to deter unreasonable law enforcement activity (a suggestion that was denied explicitly by the United States Supreme Court in *Leon,* —— U.S. at ——– ——, 104 S.Ct. at 3418–19.)[5], in this instance the results of any tests of blood drawn from defendant Fountain pursuant to the search warrant issued on March 29, 1984 must be suppressed.

---

4. This is not a case in which haste or emergency circumstances were mitigating factors. The affidavit was sworn to two months after Spikerman's body had been discovered.

5. *See particularly U.S. v. Leon,* —— U.S. ——, —— n. 20, 104 S.Ct. 2317, 3421, n. 20, 76 L.Ed.2d 527:

 * * * * * *

Grounding the modification [of the exclusionary rule] in objective reasonableness, however, retains the value of the exclusionary rule

### ORDER

IT IS ORDERED that defendant Fountain's motion to suppress the result of the blood tests performed on blood taken from him pursuant to the search warrant issued on March 29, 1984, is GRANTED.

### APPENDIX A

### IN THE UNITED STATES DISTRICT COURT

### FOR THE WESTERN DISTRICT OF WISCONSIN

### UNITED STATES OF AMERICA

### v.

SCOTT AARON FOUNTAIN, BOP Reg. No. 39041–066, a 24 year old white male, presently incarcerated at the Federal Correctional Institution, Oxford, Wisconsin.

### AFFIDAVIT

STATE OF WISCONSIN)
 ) ss
COUNTY OF DANE )

Richard P. Staedtler, being first duly sworn on oath, deposes and says that:

1. I am a Special Agent with the Federal Bureau of Investigation and have been so employed for 15 years.

2. I have reviewed the records of the Federal Correctional Institution at Oxford, Wisconsin and they reveal that from August 7, 1983 to January 29, 1984, Boyd Spikerman was an employee of the United States Bureau of Prisons at the Federal Correctional Institution, Oxford, Wisconsin, and was employed as a correctional officer

---

as an incentive for the law enforcement profession as a whole to conduct themselves in accord with the Fourth Amendment." *Illinois v. Gates,* 462 U.S., at ——, n. 15, 103 S.Ct. at 2344 n. 15 (White, J., concurring in the judgment); see *Dunaway v. New York,* 442 U.S., [200] at 221 [99 S.Ct. 2248 at 2261, 60 L.Ed.2d 824 (1979)] (Stevens, J., concurring). The objective standard we adopt, moreover, requires officers to have a reasonable knowledge of what the law prohibits.

at that institution. On the night of January 28 and the early morning of January 29, 1984, Boyd Spikerman was the correctional officer in charge of the housing unit of FCI-Oxford designated as Juneau Cottage.

3. Correctional Officer Gary Stammen, a correctional officer at FCI-Oxford, provided information and said that he had spoken to Boyd Spikerman on the telephone at approximately 4:55 a.m. on January 29, 1984. At that time, Boyd Spikerman was present in the unit office in the Juneau Cottage housing unit. Mr. Stammen said he received instructions to go to Juneau Cottage at approximately 5:15 a.m. He arrived at Juneau at approximately 5:20 a.m. He saw Boyd Spikerman lying on the floor of the officer's unit office in a large amount of blood. At approximately 5:35 a.m. he proceeding to cell C-1 in Juneau Cottage, which was assigned to Matthew Granger and Scott Fountain. Stammen saw blood on the door knob of this cell. The door knob was removed by the FBI for analysis of the blood sample.

4. Correctional Officer Jamieson Zuehlke, a correctional officer at FCI-Oxford, provided information and said that at approximately 5:13 a.m., January 29, 1984, he had entered Juneau Cottage to conduct an official count of the inmates there. Correctional Officer Zuehlke saw Officer Boyd Spikerman lying face down in the unit office with blood around the area of his head. Officer Zuehlke knocked on the door but received no response from Boyd Spikerman. At that time Officer Zuehlke saw inmate Matthew Granger in the television viewing area of the unit. As Officer Zuehlke backed away from the unit office and radioed for help, inmate Matthew Granger approached him with his hands in front of him stating "I can't sleep. I heard them again. I tried to tell them I didn't mean to do it. Hurry, I can hear them again." Officer Zuehlke instructed Matthew Granger to lie face down on the floor with his hands behind him. Officer Zuehlke then handcuffed Matthew Granger and observed blood and cuts on the palms of Granger's hands. At approximately 5:14 a.m., Officer Zuehlke entered the unit office with another correctional officer, and upon checking Boyd Spikerman's pulse, was able to detect no pulse.

5. I also interviewed a confidential informant regarding the death of Boyd Spikerman. This confidential informant told me that he went to bed in Juneau Cottage, at FCI-Oxford, at approximately 2:00 a.m. the morning of January 29, 1984. Sometime after that during the night, while it was still dark outside, the confidential informant got up to go to the bathroom. As he opened his cell door he saw Scott Fountain, Matthew Granger, and Randall Dahlin hurrying together from the area of the correctional officer's office in Juneau Cottage towards one of the housing wings in Juneau Cottage. The confidential informant observed that Scott Fountain was wearing a blue sweatshirt with a zipper down the front.

6. During the murder scene investigation conducted later on January 29, 1984, a blue sweatshirt, with a zipper down the front, was recovered from one of the bathroom stalls in Juneau Cottage. This blue zippered sweatshirt had blood on it.

7. Cathy Schupbach was also interviewed. Ms. Schupbach stated that she is a registered nurse at the Adams County Memorial Hospital and accompanied the ambulance crew to FCI-Oxford in the early morning hours of January 29, 1984. She entered Juneau Cottage at approximately 5:45 a.m. with an Emergency Medical Technician and observed a white male lying face down in a pool of blood on the floor of the unit office. She checked the white male for any respiratory response and there was no respiratory response visible. She stated she further checked the vital signs of this individual and observed no vital signs of life and thereafter observed that the pupils on the white male had become fixed. She determined that the white male in the officer's unit office at Juneau Cottage was dead on arrival, in view of the fact that the blood had started to coagulate around the

patient. She estimated the time of death to be approximately 5:15 a.m.

8. I believe the information I received from the correctional officers identified in my affidavit is reliable because they are law enforcement officers reporting what they personally observed and also because their observations were corroborated by the observations of the citizen nurse, Ms. Cathy Schupbach. I believe the information received from Ms. Schupbach is reliable because she is a citizen medical person providing information gained in the performance of her official duties. I believe the information I received from the confidential informant is reliable because it is corroborated by information I received from other sources.

Dated this 29th day of March, 1984.

/s/Richard P. Staedtler

Richard P. Staedtler, Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me this 29th day of March, 1984.

/s/John W. Vaudreuil
Notary Public, Dane County
State of Wisconsin
My Commission: is permanent