**UNITED STATES of America**

v.

**Stephen F. CASANOVA, Defendant.**

No. 93–CR–174.

United States District Court,
N.D. New York.

Nov. 2, 1993.

Gary L. Sharpe, U.S. Atty., Syracuse, (Grant C. Jaquith, Asst. U.S. Atty., of counsel), for U.S.

Frank Policelli, Utica, for defendant.

### MEMORANDUM–DECISION AND ORDER

MUNSON, Senior District Judge.

### INTRODUCTION

Defendant Stephen Casanova was arrested on April 21, 1993, following the execution of a search warrant at his residence at 6280 Hawkins Corners Road, Lee Center, New York. An indictment handed down on May 20, 1993 charges defendant with manufacturing and possessing with intent to manufacture mari-

---

juana, in violation of Title 21, United States Code, section 841(a)(1), and also charges forfeiture of property used to commit and facilitate the commission of federal drug crimes, pursuant to Title 21, United States Code, section 853. Defendant now moves to suppress all evidence seized during the April 21, 1993 raid, and also seeks to suppress statements made by defendant at the time of the arrest which were allegedly obtained in violation of his rights guaranteed by the Fifth and Sixth Amendments to the United States Constitution. On September 17, 1993, the court heard oral argument on defendant's motion to suppress. Following argument the court denied, in a decision delivered from the bench, defendant's motion to suppress in so far as it was based upon the Sixth Amendment. The court granted a suppression hearing on specific factual issues regarding defendant's Fourth and Fifth Amendment claims. The suppression hearing was held on October 5, 1993. This Memorandum–Decision and Order constitutes the court's disposition of the motions.

### BACKGROUND

On April 20, 1993, Magistrate Judge Gustave J. DiBianco issued a search warrant for the residence of Stephen Casanova located at 6280 Hawkins Corner Road, Lee Center, New York. Magistrate Judge DiBianco's determination that probable cause existed to justify the search was based upon the affidavits of three law enforcement officers: Central New York Drug Enforcement Task Force Investigator Denis J. Cimbal; New York State Police Investigator Matthew A. Tynan; and New York Army National Guard Captain John R. Pursell. Although the validity of the search warrant is at issue in this case, the underlying chronology of events is not disputed.[1]

The investigation of defendant began following an anonymous phone call on March 9, 1993 to the Narcotics Unit of the New York State Police office located in Oneida, New York. The caller, who refused to identify himself, informed an investigator that he

---

1. The details of the investigation are culled from the affidavits of Investigator Tynan and Captain Pursell. Government ("Gov't") Exhibits ("Exhs.") 4, 7. *See also* Testimony of Pursell and Tynan, Document ("Doc.") 29, at 33–54, 59–67.

knew defendant. The informant identified defendant's address, described defendant's home, described defendant physically, and advised that defendant was growing one thousand marijuana plants in his basement. The caller further named three people, including Frank Ermenio, who were involved in the alleged marijuana growing operation.

On the same day, Investigator Tynan travelled to defendant's residence and verified the informant's description of the area. Tynan observed two cars in defendant's driveway. One of those cars was registered to Frank Ermenio. A criminal history check revealed that in 1985 defendant was convicted in the United States District Court for the Northern District of New York for conspiracy to distribute marijuana and cocaine. Ermenio was found to have been arrested in 1975 on a charge of criminal possession of a controlled substance, and in 1986 on a charge of operating a motor vehicle under the influence of drugs. The former charge against Ermenio was dismissed; the latter resulted in an unconditional discharge.

On April 12, 1993 Investigator Tynan interviewed a confidential source ("CS") regarding defendant. CS had been cooperating with state police since a February 1993 arrest for criminal possession of a controlled substance and driving while intoxicated. According to Tynan, CS had proven to be a reliable informant, and had made a controlled purchase of cocaine for the state police. CS professed to have known defendant for four years, having lived with him for a one year period. CS stated that defendant always had marijuana in his house, typically five to ten pounds. CS also stated that defendant was the sole supplier of marijuana to Rick Bruno, from Rome, New York. CS provided Tynan with details of Bruno's arrest in 1990 for possession of 21 pounds of marijuana, and stated that the drugs were purchased with money invested by defendant. CS stated that Bruno continued to sell marijuana, and

that Bruno had recently contacted CS for the purpose of selling him high grade marijuana.

On April 1 and April 19, 1993 Tynan and Captain Pursell surveilled defendant's residence with an infrared tracking device ("ITD"). The ITD used in this instance was an AN/TAS–5. The AN/TAS–5 was developed for the United States Army to use during times of war. Its primary purpose is to locate enemy vehicles by sensing differences in thermal emissions. In recent years, however, the AN/TAS–5 has been used domestically in drug investigations; when allegations are raised that a suspect is growing marijuana indoors, the instrument is used to measure differences in thermal emissions coming from the structure to determine whether they are consistent with a marijuana growing operation.[2]

More specifically, the An/TAS–5 "detects relative differences in temperature." Testimony of Albert VanLanduyt, Doc. 29, at 7. By converting a relative amount of energy radiating from an object into a like amount of relative energy in a light emitting diode which is viewed through its eyepiece, the AN/TAS–5 allows its operator to perceive the relative "emissivity" of objects within the field of view. *Id.* at 7–8. In other words, the operator of the AN/TAS–5 is able to discern whether one part of an object is "hotter" than another part. Objects radiating at a higher degree of emission look lighter and those that are radiating less will look darker. *Id.* at 8.

As a result of their use of the AN/TAS–5 to evaluate the "heat pattern" of defendant's residence on April 1 and April 19, 1993, Investigator Tynan and Captain Pursell concluded that the pattern was consistent with that of a residence in which marijuana was being cultivated in its basement. While other residences evaluated with the AN/TAS–5 showed more heat radiating from the upper portion of the structure than from the lower portion, defendant's home was observed to be

2. The use of such devices is facilitated by the active involvement of the National Guard in drug investigations. Captain Pursell is assigned to the New York Army National Guard Narcotics Unit. Pursell testified at the October 6, 1993 suppression hearing that this unit has used the AN/TAS–5 to view structures over 50 times. Testimony of Captain Pursell, Doc. 29, at 35. The results of the use of the AN/TAS–5 have been furnished to a judge twelve times in support of a search warrant application. Ten of those applications have resulted in warrants that uncovered marijuana growing labs. *Id.* at 36.

emitting more heat from the basement than from the top of the house.

Investigator Tynan also obtained information regarding defendant's use of gas and electricity at his residence. Tynan displayed that information in graphs submitted to Magistrate DiBianco along with his affidavit in support of the search warrant. *See* Graphs, Exh. A attached to Gov't Exh. 7. The graphs depict a dramatic increase in electric power consumption from 1990 to 1991. Tynan related in his affidavit that in his experience it is common for persons engaged in the growing of marijuana to use electric power for lighting, irrigation, and drying systems, thereby causing excessive electric power usage. Investigator Tynan concluded that "the power usage at 6280 Hawkins Corners Road ... is consistent with an indoor marijuana growing operation." Gov't Exh. 7, at ¶ 19.

Investigator Tynan and Captain Pursell reported the results of their investigation in their affidavits submitted to Magistrate DiBianco. *See* Gov't Exhs. 4, 7. On April 20, 1993 Magistrate DiBianco signed a search warrant based on the submitted affidavits. *See* Doc. 4.

Upon execution of the warrant, law enforcement officials found and seized marijuana growing equipment and about 389 marijuana plants in various stages of development. During the search of his home, defendant stated that all the marijuana was for his own use, opined that marijuana has no adverse effect on anyone, and admitted to burning marijuana stalks in his living room fireplace.

### DISCUSSION

Defendant vigorously argues that Investigator Tynan and Captain Pursell "either intentionally misled Magistrate DiBianco or showed a reckless disregard for the truth in their application for the search warrant." Supplemental Affidavit of Attorney Policelli,

Doc. 26, at ¶ 4. More specifically, defendant claims that certain statements of the affiants regarding heat emissions from defendant's home mischaracterized the capabilities of the ITD, and thus tainted the warrant. In addition, defendant argues that the use of the ITD to detect the radiation patterns emitting from his home violated his Fourth Amendment rights. For these reasons he further argues that all evidence derived from the use of the ITD is "fruit of the poisonous tree," and thus moves to suppress all evidence garnered through the April 21, 1993 raid on defendant's home. Finally, defendant moves for exclusion of all inculpatory statements he made to law enforcement officials during the raid, on the basis that these statements were obtained in violation of defendant's Fifth Amendment rights. The court will first address the validity of the search warrant and the evidence derived therefrom, and then will deal with defendant's oral statements.

### I. THE SEARCH WARRANT

The question of whether the pre-warrant use of an ITD constitutes a search under the Fourth Amendment is an issue of first impression in this Circuit. Although courts in other circuits have uniformly held that the use of such devices is not a search,[3] defendant presents a strong argument that a different result is mandated in the Second Circuit by *United States v. Thomas*, 757 F.2d 1359 (2d Cir.1985). Although it would be interesting to address this contention, the court need not resolve defendant's Fourth Amendment claim in order to decide the motion to suppress.

■ To determine whether a particular warrant was supported by probable cause the court must disregard allegations in the warrant application that were tainted because they were knowingly false or asserted with reckless disregard for the truth. *Franks v.*

---

**3.** District courts in both the Ninth and Third Circuits have held that the use of similar equipment was not a search under the Fourth Amendment. *See United States v. Kyllo*, 809 F.Supp. 787 (D.Or.1992); *United States v. Deaner*, No. 92–0090, 1992 WL 209966, 1992 U.S.Dist.LEXIS 13046 (M.D.Pa. July 27, 1992), *aff'd on other grounds*, 1 F.3d 192 (3d Cir.1993); *United States*

*v. Penny–Feeney*, 773 F.Supp. 220 (D.Hawaii 1991), *aff'd on other grounds*, 984 F.2d 1053 (9th Cir.1993). In each of those cases, an infrared device was used to detect the pattern of heat emitted from a structure, a search warrant was obtained, and the execution of the warrant revealed a marijuana production operation.

*Delaware,* 438 U.S. 154, 155–56, 98 S.Ct. 2674, 2676, 57 L.Ed.2d 667 (1978); *United States v. United States Currency in the Amount of $228,536.00,* 895 F.2d 908, 919 (2d Cir.1990). Thus, the first task for the court in the case at bar is to determine whether any such statements were included in the documents which resulted in the warrant authorizing the April 21, 1993 search of defendant's residence. Defendant asserts that there were. Supplemental Affidavit of Attorney Policelli, Doc. 26, at ¶ 4. However, the court finds no statements in the affidavits of Investigator Tynan or Captain Pursell which support defendant's argument.

■ Defendant essentially claims that certain statements made by the affiants in their application for the search warrant are misleading to the extent that they indicate that the ITD can detect the actual temperature of an object. In particular, defendant objects to the statements by Captain Pursell that "[w]hen viewed through the ITD, the residence was emitting a tremendous amount of heat inconsistent with heat distribution of structures of similar construction, especially those in the Hawkins Corners Road area," Pursell Affidavit, Gov't Exh. 4, at ¶ 6, and that the "foundation in the front left and front center of the residence was still abnormally hot." *Id.* at ¶ 8. In addition Investigator Tynan's affidavit cited Pursell's finding that "the Thermal Imaging Device revealed an extraordinary amount of heat being emitted from Casanova's residence." Tynan Affidavit, Gov't Exh. 7, at ¶ 16.

The testimony of both Albert VanLanduyt for the Government and Edwin Morris for the defendant at the October 6 suppression hearing revealed that the AN/TAS–5 can not discern the temperature of any object; at least not in quantifiable or absolute terms. The ITD produces a visual image based on the infrared emissions of objects in its field of view. The device displays different shades of red, with the intensity of any given object depending on its emissivity. By viewing the image, the operator of the ITD can discern only *relative differences* in emissivity between objects within the ITD's field of view.

These differences are indicative of the relative temperature of objects in the field of view.[4]

Thus, given the fact that Captain Pursell could not have obtained from the ITD specific evidence that any part of the foundation was "abnormally hot" or even that the house was emitting "heat" *per se,* the court must look closer at defendant's argument. Other statements in the Pursell affidavit, and other testimony elicited at the October 6, 1993 hearing belie the claim that the affiants either engaged in deliberate deception or demonstrated reckless disregard for the truth. Of particular importance is Captain Pursell's repeated reference in the warrant application to the "heat pattern" or "heat signature" of defendant's residence. *See* Pursell Affidavit, Gov't Exh. 4, at ¶¶ 7–9. The use of such terms indicates that Pursell was referring to the *pattern* of relative emissivity as displayed by the ITD when he drew his conclusions about the "heat" emanating from defendant's residence. The court is satisfied that determining the existence of such a pattern is well within the capabilities of the AN/TAS–5.

Additionally, Pursell testified at the October 6 hearing that, in his experience in using the AN/TAS–5, he had noted that the "normal" pattern for a home is that the foundation is substantially colder than the rest of the structure. According to Pursell, the amount of heat emitted from a structure typically increases with elevation. Doc. 29, at 39. The comparison of the heat signatures of various residences was the primary focus of Captain Pursell's affidavit. Pursell used the AN/TAS–5 to observe defendant's home, and compared the results with those derived from observation of other homes of similar construction. He found that the pattern of heat emitted from defendant's home was inverse to that of similar homes in the same area, with more heat radiating from the basement than from any other portion of the house. Based upon this fact, and upon his previous experience, Pursell drew the conclusion defendant's home was "emitting an unusual and great amount of heat." Pursell Affidavit, Gov't Exh. 4, ¶ 10. The court is

---

4. Albert VanLanduyt testified that "the normal person will call [the amount of radiation] hot and cold." Testimony of Albert VanLanduyt, Doc. 29, at 8.

persuaded by the testimony to this effect that Captain Pursell provided at the October 6, 1993 hearing, and particularly his statement that "based on how hot the brightness of the image was from the bottom to the top, as I stated in my affidavit, I would quantify that [there] was a tremendous heat loss in a basement." Doc. 29, at 47. It is clear to the court that Captain Pursell was simply drawing a conclusion based upon his experience and his specific observations as elucidated in his affidavit.

Likewise, Pursell's statement regarding the "tremendous amount of heat" generated from the foundation of defendant's home is a conclusion rather than a purported observation. Pursell did not claim that the AN/TAS–5 was capable of generating this conclusion. Rather he based his statement on the observation that the amount of heat emitted from the basement was "unequal to any other heat signatures of the residence." Pursell Affidavit, Gov't Exh. 4, at ¶ 7. The same is true of Pursell's characterization of certain portions of the home as "abnormally hot." This conclusion apparently derived from Pursell's comparison to the heat pattern of other homes in the area surrounding defendant's residence.

As for Investigator Tynan's statement that there was a great deal of heat coming from defendant's residence, Tynan admitted upon cross examination by defense counsel that his statement was derived from Captain Pursell's statements. Testimony of Investigator Tynan, Doc. 29, at 64. Indeed, the context in which Tynan made the statement was one in which he was merely characterizing the content of Captain Pursell's affidavit. *See* Tynan Affidavit, Gov't Exh. 7, at ¶ 16.

In short, nothing in the record persuades the court that either Investigator Tynan or Captain Pursell engaged in deliberate deception or demonstrated a reckless disregard for the truth sufficient to render the warrant itself invalid. While the affidavit of Captain Pursell is poorly worded, and to some degree confusing,[5] it substantially relates the facts as they existed at the time of the warrant application. Moreover the court finds that there are no false or reckless statements in the warrant application which must be disregarded in evaluating Magistrate DiBianco's determination that probable cause existed to issue the warrant. Hence, the court turns now to the analysis of probable cause.

■ The Fourth Amendment to the United States Constitution protects "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures," by requiring that "no warrants shall issue but upon probable cause." U.S. CONST. amend. IV. The existence of probable cause depends upon whether the "totality of the circumstances" presents the issuing magistrate with a "fair probability that contraband or evidence of a crime will be found in a particular case." *Illinois v. Gates,* 462 U.S. 213, 238, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983). According to the Supreme Court, "[p]robable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Gates,* 462 U.S. at 232, 103 S.Ct. at 2329. As explained in *Gates,*

> the task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.

462 U.S. at 238, 103 S.Ct. at 2332.

■ In the instant case the affidavits provided Magistrate Judge DiBianco with a substantial basis to conclude that a search would uncover evidence of wrongdoing. The information provided by the anonymous caller was detailed, and it was corroborated in

---

5. Law enforcement agencies wishing to employ such sophisticated machinery as the AN/TAS–5 would be well advised in the future to better train operators of such machinery to concisely describe what is being perceived, and why it is relevant. Affiants should describe complex investigatory tools with sufficient precision to allow the Magistrate Judge to completely understand the capabilities and limits of the device. Such operators should be particularly cognizant of the need to distinguish between observations and conclusions drawn therefrom.

many respects by Investigator Tynan's own investigation. The identity of the defendant and the address, location, and description of his residence were confirmed. The defendant and a person identified by the caller as defendant's partner were found to have been previously charged with drug crimes. The vehicle of one of these alleged partners was observed at defendant's residence. As noted by the Supreme Court in *Gates,* corroboration of some details of an informant's story makes it more likely that the informant was correct about uncorroborated facts. *See Illinois v. Gates,* 462 U.S. at 244, 103 S.Ct. at 2335. Thus the verification of the information provided to law enforcement officers, even though innocent in itself, made the informer's claim that defendant was growing marijuana in his home more credible. *See id.* at 244 n. 13, 103 S.Ct. at 2335 n. 13.

Likewise, details of the information provided by the confidential source were corroborated by independent investigation. CS identified defendant and correctly related his address. CS informed authorities that he had lived with defendant for a period of time, and that defendant always had marijuana in his home. He correctly related that Rick Bruno, whom the source identified as having been supplied marijuana by defendant, had been arrested for possessing several pounds of marijuana, and he went on to describe the circumstances of the arrest in detail.[6] The reliability of the confidential source was shown by the source's controlled purchase of cocaine for the State Police and previous instances of supplying reliable information. The firsthand basis of his knowledge was apparent in his assertion that he had lived with defendant and dealt personally with Bruno.

■ The information supplied by these informants, combined with the records of power usage that were deemed unusual by Investigator Tynan, were sufficient to create probable cause for a search even without the ITD readings and corresponding conclusions which defendant challenges. Reviewing the affidavits in a "common-sense" fashion, it is apparent that there was a substantial basis

for Magistrate Judge DiBianco to determine that a search would uncover evidence of wrongdoing. The "totality of the circumstances" here, as reflected in the submitted affidavits, would justify the issuance of a warrant with or without the information provided by use of the ITD. Thus, even if the court were to disregard the statements and conclusions regarding the ITD readings, the court still finds that probable cause existed to issue the warrant. In view of this finding, the court need not reach defendant's argument that the pre-warrant use of the ITD to detect the pattern of radiation emanating from his residence constituted an unreasonable search in violation of the Fourth Amendment. *See United States v. Kerr,* 876 F.2d 1440, 1443 (9th Cir.1989).

Defendant's motion to suppress evidence derived from the April 21, 1993 search of his home is denied in its entirety.

## II. DEFENDANT'S STATEMENTS

Defendant also seeks to suppress statements he made as the search warrant was being executed on April 21, 1993, arguing that his Fifth Amendment rights were violated. The government claims that during the execution of the search warrant, defendant volunteered that all the seized marijuana was for his personal use, opined that marijuana has no adverse effect on anyone, and admitted that he had burned marijuana stalks in his fireplace. Affidavit of AUSA Jaquith, Doc. 25, at ¶ 15; Testimony of Investigator Tynan, Doc. 29, at 62–63. In his motion papers, defendant does not contest these claims, but argues that he was in custody at the time the statements were made, and that the statements were made prior to the administration of Miranda warnings. Affidavit of Attorney Policelli, attached to Doc. 21, at ¶ 15. Because the government did not supply the court with any information about whether and when defendant was Mirandized, the court included this limited issue in the suppression hearing, along with issues

---

**6.** CS named the person with whom Bruno was arrested, the origin of the marijuana and the source of money for the purchase of the marijuana.

relating to the AN/TAS-5.[7]

After hearing the testimony of the arresting officers at the October 6, 1993 hearing, the court must reject defendant's Fifth Amendment argument. The Fifth Amendment provides that no "person ... shall be compelled in any criminal case to be a witness against himself." In *Miranda v. Arizona*, the Supreme Court concluded that "without proper safeguards the process of in-custody interrogation of persons suspected ... of crime contains inherently compelling pressures which work to ... compel [the suspect] to speak where he would not otherwise do so freely." 384 U.S. 436, 467, 86 S.Ct. 1602, 1624, 16 L.Ed.2d 694 (1966). Accordingly, the Court formulated the now-familiar procedural safeguards meant to ensure the privilege against self-incrimination. *See Colorado v. Spring*, 479 U.S. 564, 572, 107 S.Ct. 851, 856, 93 L.Ed.2d 954 (1987). While a suspect may waive the rights elucidated in the *Miranda* warnings, such a waiver must be made "voluntarily, knowingly, and intelligently." *Miranda*, 384 U.S. at 475, 86 S.Ct. at 1628.

 When a criminal defendant challenges the admissibility of an inculpatory statement, the government bears the burden of proving by a preponderance of the evidence that the statement was made voluntarily. *United States v. Diaz*, 891 F.2d 1057, 1060 (2d Cir.1989). This same burden applies where the government asserts the position that the defendant waived his right to consult an attorney and his right to remain silent. *Colorado v. Connelly*, 479 U.S. 157, 167–68, 107 S.Ct. 515, 521–22, 93 L.Ed.2d 473 (1986). The inquiry has two dimensions. *Edwards v. Arizona*, 451 U.S. 477, 482, 101 S.Ct. 1880, 1883, 68 L.Ed.2d 378 (1981); *Brewer v. Williams*, 430 U.S. 387, 404, 97 S.Ct. 1232, 1242, 51 L.Ed.2d 424 (1977). First, "the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion or deception." *Moran v. Burbine*, 475 U.S. 412, 421, 106 S.Ct. 1135, 1141, 89 L.Ed.2d 410 (1986).

Second, a waiver must have been made with a full awareness of the nature of the right being abandoned. *Id.*

In the case at bar, defendant does not claim that he was victimized by police coercion. Rather he asserts that his *Miranda* rights were not clearly and concisely administered to him prior to his making the statements sought to be suppressed. The evidence, however, does not support defendant's position. After hearing the testimony of Investigator Tynan and Senior Investigator Robert L. Boek of the New York State Police, the court concludes that the statements made by defendant were made after defendant was properly and repeatedly Mirandized, and therefore that the statements were made spontaneously and voluntarily.

Senior Investigator Boek testified that he advised defendant of his constitutional rights, as required by *Miranda*, upon execution of the warrant. Testimony of Senior Investigator Boek, Doc. 29, at 55. Boek further asserts that he Mirandized defendant a second time by reading from his Miranda Card while transporting defendant to the state police station in Lee Center, New York. *Id.* at 55–56. At the Lee Center Barracks, defendant was processed and fingerprinted, and was then returned to his residence where he awaited transportation to his arraignment.

Investigator Tynan testified at the October 6, 1993 hearing that defendant made the inculpatory statements after returning to his home from the Lee Center Barracks. Tynan averred that as he was carrying large marijuana plants through the kitchen where defendant was sitting, defendant stated "that's all for personal use." Testimony of Investigator Tynan, Doc. 29, at 62. Tynan denied having said anything to defendant to provoke the statement, and noted that although Investigator Boek was in the kitchen at the time the statement was made, defendant's statement was completely spontaneous. *Id.* at 63, 64–66.

Because defendant offers no evidence supporting his contention that he was not Miran-

---

7. Because it was undisputed that defendant had not yet been arraigned at the time he made the statements, defendant's Sixth Amendment claim was denied in an opinion read from the bench on September 17, 1993.

dized prior to making this inculpatory statement, and because the court finds the testimony of Investigators Tynan and Boek credible and convincing, the court finds that defendant was Mirandized twice. Thus his choice to speak was made with a full awareness of the nature of the right he was thereby foregoing. Further, the court finds that defendant's statement was spontaneous, and that it was the product of a free and deliberate choice, with no police coercion or intimidation. For these reasons defendant's motion for suppression of the oral statement he made on April 21, 1993 as to the marijuana being for his personal use is denied.

Unlike defendant's "personal use" statement, his admission that he had burned marijuana stalks in his fireplace was a response to a question put to defendant by Investigator Tynan. *See* Testimony of Investigator Tynan, Doc. 29, at 62–63. Tynan testified at the October 6, 1993 hearing that after observing stalks of marijuana in defendant's living room fireplace, he asked defendant if he had burned marijuana stalks. *Id.* Defendant indicated that he had. *Id.* at 63. Because defendant was advised of his rights twice before responding to Tynan's question, and because no evidence is presented that indicates any intimidation or coercion on the part of the arresting officers, defendant's motion is denied with respect to his oral statement regarding burning marijuana stalks in his fireplace.

No testimony was heard regarding the circumstances surrounding the other statement defendant allegedly made, that marijuana has no adverse effect on anyone. Indeed, no testimony was heard that such a statement was made at all. Nevertheless, given the court's finding that defendant was properly Mirandized, the court denies defendant's motion to suppress this statement as well. The denial is without prejudice, subject to renewal in a motion *in limine* before trial if circumstances warrant.

## III. CONCLUSION

In sum, defendant's motions for suppression of evidence derived from the April 21, 1993 raid of his home, and of statements made subsequent to his arrest, are denied.

It is So Ordered.