UNITED STATES of America, Plaintiff,

v.

Michael C. FIELD, Defendant.

No. 94–CR–13–C.

United States District Court,
W.D. Wisconsin

June 9, 1994.

Robert Anderson, U.S. Atty., for U.S.

Peter Wold, Wold, Jacobs & Johnson, Minneapolis, MN, for defendant.

## ORDER

CRABB, Chief Judge.

In a report and recommendation entered on May 6, 1994, the United States Magistrate Judge recommended that the court deny defendant's motions to identify an informant and to produce sentencing guideline information and grant defendant's motion to suppress evidence. The government has filed objections to the report; defendant has advised the court he has no objections to it, with the exception of one sentence in which reference is made to the defendant's growing marijuana on his property. For the reasons that follow, I adopt the recommendations of the magistrate judge in full, although I disagree with his proposed conclusion that the affiant acted with reckless disregard when he described defendant's electrical usage.

 I start with the question of the legality of obtaining thermal images of a residence without obtaining a search warrant. As the magistrate judge noted in his comprehensive discussion of the law on this subject, the

Court of Appeals for the Seventh Circuit has not ruled on this question and the few courts that have addressed the issue are split. I agree with the magistrate judge that obtaining a thermal image of a residence is a search of that residence, requiring a warrant. It is not convincing for the government to argue that a homeowner "abandons" the heat that escapes from every heat source within his house, including himself; the truth is that the homeowner has no power to stop the escape of such heat. It is equally unpersuasive for the government to argue that the heat imager is only a "passive" device that cannot "see through walls." Whether a device is passive is irrelevant; what is relevant is what the device records. As for not seeing through walls, the imager records the heat escaping from the walls that is emitted by an object on the other side of the wall. To the extent the device can pick up such radiation and record it, it can "see through" walls. In this case, for instance, the imager recorded the thermal energy emitted by a dehumidifier inside a closet within defendant's residence. The imager did not reveal that the heat emitting source was a dehumidifier, but it did reveal facts about activities within the house: the fact of the heat emission and its general location.

The government argues that thermal imaging is no more intrusive than allowing dogs to sniff baggage, *see, e.g., United States v. Place,* 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983), or placing a beeper on a car, *United States v. Knotts,* 460 U.S. 276, 103 S.Ct. 1081, 75 L.Ed.2d 55 (1983), but the argument is unconvincing. Thermal imaging can extract information from within a person's home, the place most deserving of protection from government intrusion. This information is more detailed than mere records of gas or electrical usage or observations of smoke rising from a chimney. The imager can pick up heat sources of many kinds, including those not commonly thought of as such. To this extent the imager "intrudes" into the home, the place that has always enjoyed the highest level of protection in Fourth Amendment jurisprudence. A person can expect that his movements in a car may be tracked or that the suitcase he takes with him on a trip might be subject to inspection; he does not expect that his activities within his own home will be subject to high technology surveillance of the sort employed here. Unlike the dogs employed to sniff for contraband, the thermal imager picks up information of lawful activities as well as unlawful.

 I turn next to the question whether the affiant for the search warrant made false material statements or omitted material facts from his affidavit intentionally or recklessly. On this question I part company with the magistrate judge. He found that it was improper for the affiant (Polk County deputy sheriff Ray Joy) to aver that the manager of the local electric company had told him that "the normal Barron Electric Co. customer with a residence similar to Field uses on average $80 worth of electricity a month." In truth, the manager had told Joy that the normal single family residence in the area used that amount of electricity. At the suppression hearing, Joy testified that he was aware before he swore to the affidavit that defendant's property included not only a residence, but two sheds approximately 40' × 50', and a "shack." The magistrate judge found that Joy had told the truth about what he saw and did not see on defendant's property and that he was not reckless in failing to observe more than he did, yet the magistrate judge concluded that Joy was reckless in arriving at his determination that defendant's electric bill was out of line with comparable properties and "consistent with past experience in indoor marijuana grows," as Joy had averred. The magistrate judge concluded that Joy had misled the court that issued the warrant by putting the statement about the comparability of electrical use into the mouth of an "expert" who had not actually reached the conclusion attributed to him and who had not been advised by Joy that the property included the two sheds and the shack.

With respect, I do not agree with this evaluation of Joy's actions and statements. Joy observed what seemed to him to be a single family residence; he asked the electric company manager about the normal electric bills for single family residences; he simply elided the information when he made out the affidavit. Defendant averred in the affidavit

he filed in support of his motion to suppress that he had a farming operation that included at various times free-range chickens, pigs, goats and cattle and that the outbuildings were all wired for electricity. The fact remains, however, that Joy never saw any of the animals until he executed the search warrant and then he saw about twenty cattle and two goats. He never saw the electrical lines running to the pole barns and the shack. He reported what he believed he had seen: a single family residence. The manager gave him information on that basis. Had Joy spelled out what he had done when he prepared the affidavit, the result would have been the same: the court would have known that Joy had observed what appeared to him to be a single family residence and the electric company manager said that the average single family residence uses $80 of electricity a month. The magistrate judge placed weight on Joy's omission of any mention in the affidavit of the two sheds and the shack. I agree that it would have better for Joy to have mentioned these, but I do not agree that the omission was significant. In the absence of any indication of a significant farming operation, the presence of some outbuildings changes little about the picture Joy presented to the utility manager. I do not agree that the omission of this information reaches the level of recklessness.

■ However, this disagreement with the magistrate judge does not affect my agreement with his conclusion that the affidavit was insufficient to support the issuance of a search warrant. Unless one is willing to accept the proposition that any household that uses significantly more electricity than the average is fair game for a search by law enforcement officials, and I am not, this warrant must fail. The only additional information adds nothing of any significance to the probable cause showing, consisting as it does of one two-year-old statement from a citizen informant who is of unknown veracity and reliability and whose source of information is entirely unexplained; an observation of blush-colored lights at Christmas time; and light emanating from behind closed curtains at 3:00 a.m.

Even under the good faith perspective mandated by *United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), this warrant cannot survive. The implication of criminal activity is simply too weak to make it objectively reasonable for the officers to rely upon the warrant.

### ORDER

IT IS ORDERED that the findings of fact and conclusions of law proposed by the United States Magistrate Judge in the report and recommendation entered herein on May 6, 1994 are ADOPTED as the court's own, with the exception of his proposed conclusion that deputy sheriff Joy acted with reckless disregard when describing defendant's electrical use and with the exception of the one statement at page 1536 that "everyone knows that Field really was growing marijuana indoors," which is a proposition that has not yet been proven. FURTHER, IT IS ORDERED that defendant's motions to identify an informant and to produce sentencing guideline information are DENIED and defendant's motion to suppress the evidence obtained from the search of his property conducted on February 8 or 9, 1994 is GRANTED.

### REPORT AND RECOMMENDATION

CROCKER, United States Magistrate Judge

### *REPORT*

The grand jury has charged defendant Michael C. Field with one count of growing marijuana. Before the court for decision are Field's motion to compel disclosure of the identity of an informant motion to compel production of guideline sentencing information and motion to quash arrest and to suppress evidence illegally seized. For reasons stated below, I am recommending that this court deny the motion to identify the informant, deny the motion for production of sentencing guideline information, and grant the motion to suppress evidence.

### *Motion to Identify the Informant*

The only informant used in this case by the government was the unnamed citizen informant mentioned in the affidavit in support of

the complaint for a search warrant. The government has invoked its informant privilege under *Roviaro*. Neither side has briefed the issue.

■ Having read the search warrant affidavit, it appears that the informant was not a witness to the charged crime of growing marijuana, but was the proverbial "mere tipster." There is no basis to compel the government to disclose this person's identity.

## Motion to Produce Sentencing Guideline Information

■ Field has moved for this court to order the government to disclose its sentencing guideline calculations in this case as well as all evidence relating to these calculations. In his brief on this issue, Field specifies eight types of information he seeks, all of which would show the government's position on what the appropriate sentence under the guidelines would be for Field if Field is convicted. Field supports his request by referring to his Sixth Amendment right to effective representation by counsel, and to his need to make a knowing and intelligent guilty plea pursuant to Rule 11, F.R.Cr.P., if that is his choice.

The arguments are uncompelling. As the government points out, it has laid all its cards on the table in this case by opening its file to Field during pretrial discovery. Field and his attorney are just as capable as the government's attorneys of applying the various guidelines to the information so produced. Having the government offer its opinion adds nothing substantive to this process; as both sides are aware, their opinions and predictions are not binding on the court.

As for the Rule 11 argument, this court is proscribed from participating in plea negotiations in any way. Ordering the government to reveal its thought process and opinions is tantamount to compelling plea negotiations. If the government wishes to pursue a negotiated guilty plea with Field, it is free to offer its views on which guidelines apply to Field in this case. If this were to result in a change-of-plea hearing, the court would assure itself that Field did in fact possess accurate and sufficient knowledge about sentencing possibilities before the court would accept Field's guilty plea.

## Motion to Suppress Evidence

Field has moved to suppress all evidence obtained by the government in its search of his premises pursuant to a warrant issued by the Circuit Court for Polk County. Since the single charge against Field of growing marijuana is based almost entirely on the evidence so seized, granting the motion would likely dispose of the case.

In deciding this motion, the court must answer these questions:

(1) Was the government's use of a thermal imaging device an illegal warrantless search?

(2) Did the affiant for the search warrant intentionally or recklessly make false material statements or omit material facts from his affidavit in violation of *Franks v. Delaware*, 438 U.S. 154 [98 S.Ct. 2674, 57 L.Ed.2d 667] (1978)?

(3) Did the Polk County Circuit Court err by issuing a search warrant unsupported by probable cause?

(4) If the answer to question (3) is yes, is the evidence seized still admissible against Field at trial on the basis of the good faith exception set forth in *United States v. Leon*, 468 U.S. 897 [104 S.Ct. 3405, 82 L.Ed.2d 677] (1984)?

Without conceding that Field had met his preliminary burden to be entitled to a *Franks* hearing, the government nonetheless agreed to put its case agent on the stand in order to adduce the evidence necessary to resolve the motion on its merits.

For the purpose of this report and recommendation, I find the following facts:

### FACTS

**The Government's Use of a Thermal Imager**

Captain Paul Russell has spent four years as an operations officer for the Wisconsin National Guard's drug control program. Transcript of the April 5, 1994 suppression hearing. His duties include providing support to law enforcement agencies. Capt. Russell's specialty is thermal imagery. Capt.

Russell spent ten days in a DEA thermal imagery system course, which resulted in the DEA certifying Capt. Russell as a thermographer.

Thermal imagery is the use of infrared detection equipment to provide a visual image to heat radiating from an object being analyzed. A thermal imaging device collects thermal energy and converts that energy into a color on a predetermined color scale. The device is passive. It does not emit beams or rays. According to Capt. Russell, in normal use, neither the heat sources inside the structure nor the infrared waves of heat radiating therefrom are visible.[1]

Capt. Russell has never seen a situation in which any object or material has been used to shut down totally heat emanating from a structure; in his experience, all objects radiate *some* thermal energy, be it solar re-radiation or artificially generated. In Capt. Russell's opinion, a thermal imager cannot detect people, animals or a hot cup of coffee unless they are in the direct "line of sight" of the imager. Literature that Capt. Russell has read suggests that current thermal imagery technology would allow the detection of contraband hidden inside the walls of buildings. Capt. Russell has no personal knowledge whether this is true.

In this particular case, Capt. Russell had occasion to use an AN–PAS–18 Stinger thermal sight. The Stinger is about 18 inches long, 8 to 10 inches wide, weighs about five pounds, and can be powered by a portable battery or by a plug into a car's cigarette lighter.

To use the Stinger, the operator first warms up the imager and adjusts the controls so that the view screen shows actual objects with somewhat less detail than a television picture. Then the operator adjusts the brightness and gain so that there is a neutral starting position that will allow hotter and cooler objects to be visualized. The Stinger uses a "gray" scale, with white being

the visual representation of the hot end of the scale and black being the visual representation of the cold end of the scale. "Hot" and "cold" are relative terms because the Stinger does not quantify temperature; it simply provides a visual image showing which objects are radiating more or less heat than the baseline set by the operator during warmup. Often, but not always, the baseline will be the air temperature, the normal temperature of the structure being viewed, or both, since they tend to be the same at the time the Stinger is used.

Time of use is important; the operator must wait until late night or early morning so that all loaded solar energy has dissipated from the objects to be viewed. The operator then approaches to within 20 to 200 meters of the object to be analyzed, securing an unblocked "line of sight." [2]

While there are various uses to which thermal imagery can be put, the DEA emphasizes search and rescue, detection of lost and fleeing people, and profiling indoor marijuana growing operations. Toward the end of profiling a marijuana grow, the DEA trains thermographers to look for hot spots that would indicate heat sources inside a building.

On February 6, 1994, at around 2:00 a.m., Capt. Russell, equipped with the Stinger thermal imager, accompanied law enforcement investigators Hake and Carr in a truck to a location on a public road about thirty to forty meters from defendant Michael C. Field's home.[3] Capt. Russell knew that the purpose of the mission was to conduct a thermal surveillance of Field's premises in support of the County's investigation of a suspected indoor marijuana growing operation.

As was his routine, Capt. Russell set the gain on the thermal imager all the way down so that it would only pick up (i.e., show as white) objects that were emitting "a lot of heat." Capt. Russell then trained the ther-

---

1. During cross examination, Capt. Russell refused to opine that a thermal imager could track movement of a heat-radiating object within a building.

2. Or more accurately, a position as free as possible from barriers that would interfere with the

reception of any heat radiating from the object to be viewed.

3. The February 8, 1994 affidavit in support of the warrant incorrectly states that the date was March 6, 1994, a temporal impossibility.

mal imager upon the largest building visible to Russell on Field's premises, which Russell believed was the house. Capt. Russell did not survey any other buildings at the Field premises; in fact he does not even recall seeing any other buildings. Neither Capt. Russell nor the law enforcement investigators requested permission of Field to survey Field's house.

Capt. Russell detected a "hot spot," or "isolated heat source" on Field's house. Specifically, with the air temperature and the rest of Field's house showing gray in the Stinger thermal imager, Capt. Russell saw a white area on Field's house. Capt. Russell had no idea what was located inside Field's house, except that there was an isolated heat source somewhere in the area of the white spot. Capt. Russell advised the law enforcement investigators that he had found a hot spot and described its location on the exterior of the house. Capt. Russell offered no interpretation or opinion whatsoever to the investigators; he simply identified the existence and approximate location of the hot spot.

Upon completing the thermal surveillance of Field's house, Capt. Russell thermally surveyed two other similar structures elsewhere in the County in order to establish the equivalent of a control group. Russell located no "hot spots" on these structures.

### Field's Electricity Use Records

Ray Joy has been employed fifteen years as a deputy sheriff and four years as a drug investigator with the Sheriff's Department in Polk County, Wisconsin. In the course of his employment Joy has investigated about a dozen indoor marijuana growing operations. One of those investigations involved Michael C. Field, the defendant in this case.

On February 8, 1994, Joy executed a *subpoena duces tecum* on the Barron Electrical Cooperative to obtain and review the electricity bills for Field's residence. Joy wanted to see whether Field's electrical use was high. The records provided by the electrical company showed the monthly use and bills for the preceding twelve months. The twelve month total was 34,420 kilowatts (KW) billed at $2311.83, which averaged about 2868 KW per month at $192.65 per month.[4] The lowest use month was May, 1993; the lowest bill was $165.50 in February, 1993; the highest use and highest bill were both January, 1994, at 3600 KW at $232.60.

Joy reviewed Field's electricity bills with the manager of the electricity coop. The manager was not personally familiar with Field's residence. The manager told Joy that a normal single-family dwelling in that area would use approximately $80 a month in electricity.[5] If the user was a large livestock, farming or milking operation, that amount would go up.

Joy had been raised on a farm. Joy was familiar with farms in Polk County that he would consider large milking or livestock operations. In Joy's opinion, the type of large milking or beef operation about which the coop manager was speaking would have fifty to 100 cattle and several hundred acres of land. You can see at least some of the features of a large farming operation when you drive by it.

In Joy's opinion on February 8, 1994, Field's residence had none of the characteristics of a large farm. Joy never saw any such characteristics when he drove by it. Joy had been by Field's residence approximately six times prior to February 8, 1994. Joy never saw what he believed to be a chicken coop, although he did see another building. Joy never saw a fence for any goats. Joy saw two steel pole sheds about 40 feet by 50 feet that he did not consider to be "barns."[6] Joy never saw electrical wires between the different buildings on the property. Joy saw no farm vehicles in the yard. Joy never saw any free-roaming pigs or chickens on the premises.

---

4. The rates changed over the year, so the averages are just that.

5. Extrapolating from the average cost of electricity to Field, this would reflect a monthly use of about 1194 KW for a year's total of 14328 at a total cost of about $960.

6. Joy eventually acquiesced to using the word "barn" to describe the sheds, but he never appeared to abandon the distinction that he had made between a barn and a steel pole shed.

Joy did not consider Field's residence to be a large milking or livestock operation. By way of example, in Joy's mind, the farm across the road fit that description. Joy did not describe the size or features of that farm. Joy considered Field's property to be more of a single residence or perhaps a hobby farm rather than an active, sizeable farming operation. After talking to the manager of the electrical coop but before applying for the search warrant, Joy again drove past Field's property to look at it. Joy saw nothing that made him change his determination that this was not the type of farm about which the coop's manager had been talking.

The actual size of Field's parcel is about 80 acres. Located on the land are a two story house, the two pole sheds/barns, a chicken coop, a wood shed and an unattached garage, all but one of which were wired for electricity. On February 8, 1994, at least eight of the cattle kept by Field were permanently outside. Free range chickens and some pigs were also kept outside, as were three goats in a pen. Field kept other livestock in the sheds/barns.

### The Search Warrant

On February 8, 1994, Investigator Joy met with the district attorney, and then with Judge James R. Erickson of the Polk County Circuit Court to apply for a warrant to search Field's home. Joy's affidavit in support of the warrant application speaks for itself and is incorporated into these facts as if fully set forth. For the reader's convenience, I quote the affidavit's most substantive statements:

> In and upon certain premises described as ... a residence located at 173 70th Avenue, in the Town of Clayton, Polk County, a tan house with brown trim, located at Fire # 173, along with two large red metal sheds and an unattached garage structure;

> There are now located and concealed certain things, to-wit: marijuana, grow lights, drug records, cash, drug paraphernalia, documents showing residence, other controlled substances, weapons, and other items used to grow marijuana;

> The facts tending to establish the grounds for issuing a search warrant are as follows:

> ... Officer Bob Wallace in March of 1992 stated a citizen had told Wallace that he had been at the Field residence and had notice a very heavy odor of marijuana in the air. The citizen had stated Field also showed him loaded handguns he kept stashed around the residence. At that time, Field supposedly had approximately $5,000 in cash at the residence.

> On 2/07/94 your complainant talked with Larry Demars, Vice [President] of Clayton Bank, who indicated to your complainant that he had driven by the residence around Christmas of 1993. At that time, he observed the curtains opened on the front windows and he could see through the windows a blush-colored light glow that he has seen before over growing plants.

> \* \* \* \* \* \*

> Through this [thermal] imager, Russell detected abnormal amounts of heat radiating from areas of the residence. Russell did locate a chimney system but this was not the source of the heat. Also due to the hour of the day, sunlight was not the source.

> \* \* \* \* \* \*

> Although there was no light visible in the residence to the naked eye, through ... night-vision glasses officers could see large amounts of light coming from around the windows and doors in the Southeast part of the building. With this information, it appears to officers that some shielding material has been placed over the windows to block light.

> \* \* \* \* \* \*

> Your complainant states that past experience and training has showed that growing marijuana indoors requires grow lights which are quite bright and consume large amounts of electricity. It also has showed that persons block out windows to hide this light. Electrical consumption can possibly show the use of these lights.

> \* \* \* \* \* \*

> In reviewing [Field's electrical] records, it was noticed that during [2/19/93 to 1/24/94] Field's smallest electrical bill was $165.50 in February of 1993. This ranged to a high of $232.60 in January of 1994. It appears that Field's electrical bills have

remained consistently in the $185 range through the summer months and through the winter months. [The Barron Electric Company's manager] states that the normal Barron Electric Co. customer with a residence similar to Field uses on average $80 worth of electricity a month. This would indicate that there is a considerable amount of electricity being consumed by Mr. Field and that is consistent with past experience in indoor marijuana grows. Complainant then compared Field's bills with known marijuana grows he has investigated in the past and found the usage and billing information to be somewhat similar between them.

Judge Erickson issued the warrant, and it was apparently executed that same day. Once on the property to execute the search warrant, Joy noticed perhaps twenty to 25 young cattle between the house and the pole shed down by the satellite dish. In executing the search warrant, agents entered at least one of the pole sheds on the property. From outside the pole shed, an observer would be unable to see anything suspicious, even if the door were open. Once inside, however, a person could go down a side walkway and discover a marijuana grow operation hidden under piles of hay. Officers apparently did so, and seized the growing marijuana plants, which form the basis of the charge against Field.

Inside Field's house, agents found a standard household dehumidifier in the area that had registered as a hot spot on Capt. Russell's infrared detector. In a subsequent conversation between Capt. Russell and Joy, Capt. Russell stated that the dehumidifier was a possible source of the heat that the infrared detector had noted, but Capt. Russell declined to offer any further opinion.

## ANALYSIS

Having reviewed the case law and having applied it to the facts found above, I note at the outset that the decision on Field's motion to suppress is a close one that could perhaps go either way. What makes it close is the deferential standard of review mandated by *United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). Absent that, the warrant would certainly fail for lack of probable cause.

Having considered the parties' arguments regarding the thermal imager, the *Franks* issues, and the question of probable cause, I am recommending that this court redact the search warrant affidavit's reference to the thermal imager, redact the statement attributed to the electrical coop manager, add certain facts known to the affiant, then assess probable cause in light of these changes. My analysis of probable cause leads me to conclude that it is lacking; I also find that the warrant is not saved by the good faith exception. I am therefore recommending that this court grant Field's motion to suppress.

## I. THE PREWARRANT USE OF A THERMAL IMAGER WAS IMPROPER

Field argues that the government violated his Fourth Amendment rights by subjecting his house to a scan by a thermal imager without first obtaining a warrant. The Court of Appeals for the Seventh Circuit has not ruled on this issue. Courts that have considered the question are split, with a sizeable contingent that has avoided taking a stand. I agree with the courts that find thermal imagers intrusive, and therefore recommend that this court redact from the search warrant affidavit the references to the use of a thermal imager.

### A. Courts That Have Approved of Thermal Imaging Without a Warrant

The most quoted case in support of prewarrant use of thermal imagers is *United States v. Penny–Feeney,* 773 F.Supp. 220 (D.Hawaii 1991), *aff'd on other grounds sub nom. United States v. Feeney,* 984 F.2d 1053 (9th Cir.1993). In *Penny–Feeney,* officers received detailed and recent information from two informants that the defendants were operating an indoor marijuana growing operation at their home. Within three weeks, an officer hired a private company to fly the officer over defendants' property in the company's helicopter to perform thermal imaging with the company's machine. 773 F.Supp. at 222–223. In describing the imag-

ing device, the court noted that it did not send beams or rays into the area on which it was fixed, nor did it in any way penetrate structures within that area. *Id.* at 223. The court thought it important to stress that "the instrument's sole function is to detect differences in surface temperatures of objects." *Id.*

At 5:30 a.m. the officer and the pilot flew the helicopter over defendants' home at an altitude 300 to 600 feet above it. The residence was dark to the naked eye, but the imager showed the walls and areas of the garage as bright white, showing that "heat was escaping from the structure." *Id.* at 223–24. The pilot, who had used the imager 15 to 20 times before, told the officer that based on his experience, the heat image of defendants' home would be consistent with a structure being used for an indoor marijuana grow using artificial lights, since such lights produce large amounts of heat. In his search warrant affidavit, the officer stated that he saw no internal heat source such as a chimney that would account for the heat that was imaged; he further stated foundational facts showing why the heat that had been imaged would be consistent with an indoor marijuana grow. *Id.* at 224.

The district court upheld the warrant against defendants' challenge. The court held that, under the test of *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) the defendants had no legitimate expectation of privacy that would prevent the use of the thermal imaging device. 773 F.Supp. at 225. The court noted that the imaging device simply detected emanations of heat or the absence thereof; the court seemed to think that this made the targeting of the exterior of defendants' home acceptable. *Id.* The court also felt that *Katz* required the court to examine "the nature of the heat itself." *Id.* Noting that defendants not only failed to attempt to impede the escape of the heat or exercise dominion over it but had actually vented it, the court determined that the heat was "abandoned heat" or "heat waste." *Id.* The court found that the defendants had exhibited no subjective expectation of privacy in the heat waste, analogizing it to garbage left on the curb. *Id.* at

226, citing *California v. Greenwood,* 486 U.S. 35, 37, 108 S.Ct. 1625, 1627, 100 L.Ed.2d 30 (1988).

The court felt that the government's use of "extrasensory nonintrusive equipment" such as a heat imager fell within the parameters of other warrantless searches previously approved by the Supreme Court. *Id., citing United States v. Knotts,* 460 U.S. 276, 103 S.Ct. 1081, 75 L.Ed.2d 55 (1983) (beeper on a can in a car at a cabin), *United States v. Place,* 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983) (drug sniffing dog at an airport) and *Smith v. Maryland,* 442 U.S. 735, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979) (pen registers). The court found the use of the infrared thermal imager to be inoffensive because it entailed no embarrassment, no search of the person, detected a physical fact rather than a communication, detected heat that had been "*deliberately* vented," (773 F.Supp. at 227, emphasis in original), did not observe intimate details connected with the use of the home and caused no physical invasion of the home. *Id.* at 228.

As noted below in Section I.C, the Court of Appeals for the Ninth Circuit, in upholding the district court's decision in *Penny–Feeney,* explicitly declined to rule on the constitutionality of using a thermal imager on a home prior to obtaining a warrant.

The Court of Appeals for the Sixth Circuit noted the use of a thermal imager as one piece of information used to obtain a warrant in *United States v. Zimmer,* 14 F.3d 286, 287–88 (6th Cir.1994) but the court did not analyze the propriety of its use, apparently because the defendant did not challenge it.

In *United States v. Broussard,* 987 F.2d 215 (5th Cir.1993), the Court of Appeals for the Fifth Circuit noted that a thermal imaging device had been used during the prewarrant investigation, and that the results, "although not conclusive," were one factor among three that tended to corroborate the informant upon whose information the search warrant affidavit was based. *Id.* at 222. Apparently the defendant had not challenged the use of the device, and the court undertook no analysis.

In *United States v. Porco*, 842 F.Supp. 1393 (D.Wyo.1994), the court upheld a search warrant that was challenged on a variety of grounds, including the government's prewarrant use of a thermal imager. The court tracked the reasoning and citations of *Penny–Feeney* in ruling that the use of the imager was proper. 842 F.Supp. at 1396–98. Again, the court found that, although the defendants had tried to ensure visual privacy by blacking out windows and positioning objects outside the home "the defendants did nothing to prevent heat from escaping." *Id.* at 1397. Even so, the court seemed to find that an effort to retain the heat would not have mattered, apparently because the means used to detect it were nonintrusive. *Id.*

In *United States v. Kurtz*, Case No. 1:CR–92–90, 1992 WL 209966, 1992 U.S. Dist. LEXIS 13046 (M.D.Pa.1992), *aff'd on other grounds sub nom. United States v. Deaner*, 1 F.3d 192 (3rd Cir.1993), the court found that the prewarrant use of an infrared scanner was allowable. While conceding that there was no evidence that the defendants had "abandoned" their heat, the court found that the Fourth Amendment did not prohibit the government from using a thermal imager to detect temperature differences on the outside of the defendants' dwelling. *Id.*, 1992 WL 209966 at *3, at *7–8. The court found that the imager did not "essentially ... look through walls," but simply told the DEA which walls or roofs were warmer or cooler; "this information alone tells the DEA nothing of the activity going on inside the structure." *Id.*, n. 1. The court analogized thermal imagers to drug sniffing dogs, then found that thermal scans were even less intrusive than dog sniffs because the scans provided information that was less concrete. *Id.*, at *4, 1992 U.S.Dist. LEXIS 13046, at *11. The court's decision upholding the warrant was affirmed on appeal without consideration of the use of the thermal imager.

In *United States v. Kyllo*, 809 F.Supp. 787 (D.Ore.1992), the court upheld the prewarrant use of a thermal imaging device, adopting with little comment the analysis of *Penny–Feeney*. 809 F.Supp. at 792. The court found that the heat radiating from defendant's home in January was waste heat, that no intimate details of the home were observed, and there was no intrusion upon the privacy of the individuals within the home. *Id.*

In *State v. McKee*, 181 Wis.2d 354, 510 N.W.2d 807 (Ct.App.1993), a Wisconsin appellate court upheld the circuit court's holding that use of a thermal imager to scan defendant's home was not a search within the meaning of the Fourth Amendment. The court adopted the reasoning and holding of *Penny–Feeney* wholesale. *Id.* at 358–361, 510 N.W.2d 807. Noting that it had previously mused that "there must be a limit to the degree the government can intrude upon a person's home and curtilage with 'high-tech' equipment," *State v. Lange*, 158 Wis.2d 609, 622, 463 N.W.2d 390 (Ct.App.1990), the court nonetheless saw "no improper intrusion in this case." 181 Wis.2d at 361, 510 N.W.2d 807. The court noted that in *United States v. Solis*, 536 F.2d 880 (9th Cir.1976), the court had approved the use of a drug sniffing dog in the area of a private trailer home to detect odors emanating therefrom.

The court concluded by holding that the thermal imager was not a highly sophisticated surveillance device that could "intrude or peer into private places," that the thermal imager was passive, that it looked at the exterior of defendant's home, that it did not "invade the home or the curtilage" and that it did not reveal to the police "any of the inhabitants' activities within the walls of the house." 181 Wis.2d at 362, 510 N.W.2d 807.

## B. Courts That Have Disapproved Thermal Imaging Absent a Warrant

The leading opposition comes from the Supreme Court of the State of Washington in *State v. Young*, 123 Wash.2d 173, 867 P.2d 593 (1994). The court first ruled that the warrantless use of a thermal imager violated both portions of Article I, Section 7 of the Constitution of the State of Washington. 123 Wash.2d at 184, 188, 867 P.2d 593. Perhaps unnecessarily, the court then ruled that warrantless use of thermal imagers violated the Fourth Amendment to the U.S. Constitution. *Id.* at 194, 867 P.2d 593.

The court noted that people have a reasonable expectation of privacy in their own homes, both by virtue of the language of the Fourth Amendment and the cases interpreting it. 123 Wash.2d at 188, 867 P.2d 593, quoting the Fourth Amendment and citing *Payton v. New York,* 445 U.S. 573, 589, 100 S.Ct. 1371, 1381, 63 L.Ed.2d 639 (1980). The court noted that the U.S. Supreme Court has differentiated between the use of sensory enhancement devices in homes and in or on other objects. *Id.* comparing *United States v. Karo,* 468 U.S. 705, 104 S.Ct. 3296, 82 L.Ed.2d 530 (1984) with *United States v. Knotts,* 460 U.S. 276, 103 S.Ct. 1081, 75 L.Ed.2d 55 (1983).

The court rejected the analogy of radiated heat to garbage, stating that it would be difficult to find that people should expect other people to use sophisticated technology to "view" heat waste, and that it would be nearly impossible to avoid such viewing of one's house. 123 Wash.2d at 192–93, 867 P.2d 593. More important to the court was that, unlike a search of garbage left on a public curb,

> [t]he only value of the so-called heat waste is what it discloses about the interior of the home. The infrared device produces an image of the interior of the home that otherwise is protected by the home's walls. In this sense, the infrared thermal device allows the government to intrude into the defendant's home and gather information about what occurs there.... It is this reasonable expectation of privacy in the home that is violated by warrantless infrared surveillance, not the expectation of privacy in "heat waste" as the *Penny–Feeney* court asserts.

123 Wash.2d at 193, 867 P.2d 593.

The court also rejected the dog analogy, agreeing with the Supreme Court that a "canine sniff is *sui generis.*" *Id.* at 194, 867 P.2d 593, quoting *United States v. Place,* 462 U.S. at 707, 103 S.Ct. at 2644. Even if the analogy were appropriate, the court found that even dog sniffs could violate the Fourth Amendment if they were conducted outside a closed apartment door, revealing by means of the dog's extraordinary olfactory abilities matters occurring inside the home. *Id.,* citing *United States v. Thomas,* 757 F.2d 1359 (2d Cir.), *cert. denied,* 474 U.S. 819, 106 S.Ct. 66, 67, 88 L.Ed.2d 54 (1985), 479 U.S. 818, 107 S.Ct. 78, 93 L.Ed.2d 34 (1986). Citing again to *Karo,* the court concluded that

> When the police use sense-enhancing devices to obtain information from someone's home that could not be obtained by unaided observation of the exterior, they should have a search warrant.

123 Wash.2d at 194, 867 P.2d 593, citing *United States v. Karo,* 468 U.S. at 714, 104 S.Ct. at 3303.

In *United States v. Ishmael,* 843 F.Supp. 205 (E.D.Tex.1994), the court found that the warrantless use of a thermal imager to scan defendants' property was illegal, and that without the information obtained by the scanning, there was no probable cause to support the warrant that had subsequently been issued to search the property. *Id.* at 214. In a prefatory statement, the court noted that

> [l]eft unchecked, technology has the potential to restrict, as a practical matter, the right to privacy to the confines of *Roe v. Wade,* 410 U.S. 113 [93 S.Ct. 705, 35 L.Ed.2d 147] (1973). We must take care that the war on drugs not count as one of its victims fundamental rights. The benefits to our society of safeguarding the right to privacy is such that the courts must say that there is a limit to the use of technological weapons, even in the war on drugs.

843 F.Supp. at 207–08.

In *Ishmael,* officers suspected that defendants were running a marijuana growing operation on their property. Officers flew over the property in a helicopter equipped with a thermal imager and took pictures. The resulting video tape revealed that a metal building on the property and brush near it were "considerably hotter" than other objects. Later use of a handheld thermal imager on the ground confirmed these readings. Officers then gathered other evidence, including electrical bills that showed that the metal building had used more electricity than the mobile home on the property for two out of three summer months. *Id.* at 208–09. Officers obtained a search warrant and

seized 770 marijuana plants from the basement of the metal building. *Id.*

As noted above, the district court granted defendants' motion to suppress. Using the *Katz* standard, the court found that the defendants had a legitimate expectation of privacy in their property and that society was willing to recognize it as legitimate. The court stated that "the test of legitimacy is not whether the individual chooses to conceal his activity but instead 'whether the government's intrusion infringes upon the personal and societal values protected by the Fourth Amendment.'" 843 F.Supp. at 209, *quoting Oliver v. United States,* 466 U.S. 170, 182–83, 104 S.Ct. 1735, 1743, 80 L.Ed.2d 214 (1984).

The court excluded much of the government's foundational search warrant evidence because the officers had obtained it by trespassing upon defendants' land. *Id.* at 211. After finding that the flyovers and visual observations resulting from them were legitimate, the court noted that "the argument cannot be logically made, and the government has not attempted to argue, that the use of thermal imaging equipment to make tapes of the heat differential on Defendants' property was not a search." *Id.* at 212.

The question before the court was whether the search fit within an exception to the warrant requirement. The government first argued that the heat was in plain view, analogizing the thermal imager to the map-making camera used in *Dow Chemical v. United States,* 476 U.S. 227, 106 S.Ct. 1819, 90 L.Ed.2d 226 (1986). The district court noted, however, that in *Dow,* the Supreme Court specifically noted that surveillance of private property using highly sophisticated surveillance equipment might be constitutionally proscribed absent a warrant. 843 F.Supp. at 212. The court in *Ishmael* then found that the thermal imager used in the case before it was exactly the type of equipment the Supreme Court had had in mind; therefore, the government's appeal to the holding of *Dow* was unavailing.

The government then argued that thermal imagers were nonintrusive devices that simply detected abandoned heat. The court rejected the garbage analogy of *Penny–Feeney,* finding that the use of high tech equipment to make the discovery was distinct from a search of abandoned garbage. 843 F.Supp. at 213. The court also rejected the dog sniff analogy, finding that a thermal scan was more intrusive than a canine sniff because it could not distinguish between contraband and noncontraband, and because dog sniffs could not be conducted at 1500 feet. *Id.* at 213.

Finding no exception to the warrant requirement that would justify the search, the court excluded from the warrant all evidence obtained by use of thermal imagers. 843 F.Supp. at 213.

### C. Courts That Have Declined to Rule on the Issue

In its review of the district court's decision on the motion to suppress in *United States v. Penny–Feeney,* the Court of Appeals for the Ninth Circuit relied on all of the other evidence to uphold the district court's decision that the warrant was valid, stating that, because there was enough other evidence, "we need not and do not address whether any aspect of Officer Char's use of [a thermal imager] during helicopter surveillance of the Feeneys' home violated the Fourth Amendment's prohibition against unreasonable searches." *United States v. Feeney,* 984 F.2d 1053, 1054–55 (9th Cir.1993).

The Court of Appeals for the Eighth Circuit considered the propriety of the prewarrant use of a thermal imager in *United States v. Olson,* 21 F.3d 847 (8th Cir.1994). The court found facts regarding the imager's use, noted the split in the case law, then declined to answer the question. 21 F.3d at 849 n. 6. The court found that there was sufficient probable cause to support the warrant without reference to the results of the thermal imaging of defendant's mobile home. *Id.* The court, after describing the thermal imager as a "passive, nonintrusive system" noted that the thermal imager had revealed details of the interior of defendant's home:

> the photographs revealed rafters on the north side of the mobile home that were visible due to the extreme heat. The agent who reviewed the videotape noted as well that the mobile home appeared to be

split into two rooms; the divider wall was visible due to the transfer of heat from the north end of the home into the wall.

21 F.3d at 848, n. 5.

In *United States v. Deaner*, 1 F.3d 192 (3rd Cir.1993), the Court of Appeals for the Third Circuit declined to rule on the issue: "[b]ecause the affidavit establishes probable cause without the evidence obtained by such a device, we express no opinion on whether the use of a [thermal imaging] device in aerial surveillance of a residence is a search within the meaning of the Fourth Amendment." *Id.* at 197.

In *United States v. Casanova*, 835 F.Supp. 702 (N.D.N.Y.1993), the district court took the same approach. Responding to defendant's challenge to the prewarrant use of a thermal imager, the court noted that "although it would be interesting to address this contention, the court need not resolve defendant's Fourth Amendment claim in order to decide the motion to suppress." *Id.* at 705.

### D. Analysis

As shown in sections I.A and B, this court could find support for a decision either approving or disapproving the government's prewarrant use of a thermal imaging device. No court of appeals has explicitly taken a position on the issue. The district courts and state courts are split. I am recommending that this court side with the courts that have found the prewarrant use thermal imagers on private homes improper.

As a starting premise,

At the risk of belaboring the obvious, private residences are places in which the individual normally expects privacy free of governmental intrusion not authorized by a warrant and that expectation is plainly one that society is prepared to recognize as justifiable.

\* \* \* \* \* \*

We cannot accept the Government's contention that it should be completely free from the constraints of the Fourth Amendment to determine by means of an electronic device, without a warrant and without probable cause or reasonable suspicion, whether a particular article—or a person, for that matter—is in an individual's home at a particular time. Indiscriminate monitoring of property that has been withdrawn from public view would present far too serious a threat to privacy interests in the home to escape entirely some sort of Fourth Amendment oversight.

*United States v. Karo*, 468 U.S. at 714, 716, 104 S.Ct. at 3303, 3304.

As the cases above reveal, some courts don't even consider the use of a thermal imager a search (*e.g. McKee*) while others find the searching nature of a thermal scan inarguable (*e.g. Ishmael*). The courts that find thermal scanning innocuous emphasize the passivity of the process: a thermal imager does not send anything into the home, it simply receives and interprets escaping heat. The Wisconsin court of appeals went so far as to state that the imager did not reveal any of the activities occurring inside the home.

That thermal imagers collect heat "passively" is a red herring. High-powered telescopes trained on a partially open window in a home are "passive:" they simply collect visible light that is radiating from the room. But courts have said that the government may not use high-powered telescopes to peer into peoples' homes. In *United States v. Taborda*, 635 F.2d 131 (2d Cir.1980) agents used a telescope with a magnifying power of 36 to peer from one apartment window into another nearly 200 feet away. *Id.* at 135. The agents were able to read labels on containers and to observe the defendant snort cocaine in his own apartment. The court held that while observations that were telescopically enhanced should be suppressed, the agents' unenhanced "plain view" observations satisfied the Fourth Amendment. *See also United States v. Eschweiler*, 745 F.2d 435, 438 (7th Cir.1984), *cert. denied*, 469 U.S. 1214, 105 S.Ct. 1188, 84 L.Ed.2d 334 (1985) (acknowledging *Taborda* but leaving question open); *United States v. Christensen*, 524 F.Supp. 344, 347 (N.D.Ill.1981) (Upholding a search where the binoculars used "[did] not rely on laser beams or infra red light to detect images not otherwise visible. Rather, they merely magnif[ied] what would in any event be apparent to the naked eye"); *United States v. Kim*, 415 F.Supp. 1252, 1256

(D.Haw.1976) (use of 800 millimeter telescope to observe activities inside apartment a quarter mile (that is, about 400 meters) away violated Fourth Amendment).

Similarly, nonconsensual wiretaps are "passive": they simply collect processed sound waves pulsing through a wire located outside of the home. But the government may not intercept them without a court order. *See* 18 U.S.C. § 2510 *et seq.* Passive devices are quite capable of invading a person's reasonable expectation of privacy in his or her home by revealing what is occurring therein.

As for the notion that thermal imagers do not reveal activities that occur inside the home, if this is so, then why does the government use thermal imagers to try to detect indoor marijuana growing operations? Perhaps it is a matter of word choice. Thermal imagers don't see through walls in the sense that a telescope sees through a window. But the devices provide visual images of varying clarity that allow the operator to draw, attempt to draw, or claim to draw, conclusions about what is happening on the other side of the house wall.

In light of the limited facts adduced at the April 5, 1994 evidentiary hearing regarding the capabilities of thermal imagers, this case may not be well suited for drawing broad conclusions. Captain Russell seemed to go out of his way to undersell the capabilities of thermal imaging. Such coyness is a two-edged sword: if the thermal imager doesn't tell the government anything useful, then it has no value in determining whether there is probable cause to issue a search warrant.

As noted in Section I.C, the thermal imager used in *Olson* revealed interior rafters and room dividers. In *Young*, the parties entered into a "Stipulation Regarding Technical Capabilities of the Infra–Red Thermal Imager" which stated, among other things, that thermal imagers are capable of revealing the presence of human forms near open windows or behind walls made of plywood or similar material. 123 Wash.2d at 193, 867 P.2d 593. The training literature that Captain Russell received required operators to determine the level of coffee in a cup, and tear ducts on a human face.

So, it is disingenuous for the government to argue that thermal imagers do not reveal what is happening inside of a home. The whole point of the exercise is to attempt to learn what is happening inside of the home. Depending on the skill—or perhaps the audacity—of the person interpreting the thermal image, the government can actually discern, or claim to discern some very detailed information about what is happening inside of a home being scanned.

Hypothesize a homeowner at 1:00 a.m. lying immobile on his bed in a first story bedroom smoking a cigarette, with a cup of coffee on the night stand, watching late night television. There are French doors out to a ten foot patio, leading to a forty foot backyard, beyond which is an alley that is public access. The doors are open to let in air, but lightweight curtains are drawn to ensure privacy. Could a properly trained operator with a currently available thermal imager scan the house from the alley, fifteen meters distant, and discern the heat sources in the bedroom and draw accurate conclusions about what was happening inside that room?

Despite Captain Russell's reluctance to answer questions of this ilk, I surmise that if other variables were accounted for, the answer would be yes. In that case, there is no doubt that a search has occurred and that the homeowner's reasonable expectation of privacy has been invaded.[7]

If the operator *cannot* discern what is happening inside the bedroom, what is to prevent him from interpreting the hot spots that are being imaged as "consistent with an indoor marijuana growing operation?" The scan is still a search, but one that takes on undertones that are more sinister: late night

---

**7.** Backing off slightly, there is no doubt that a properly trained operator using a thermal imager could, under appropriate conditions, detect if a guest room was radiating heat, indicating that a visitor was present, or could detect heat radiating from a bathroom as a result of the prolonged presence of hot water from a bath or shower and/or heat lamps, or could detect heat from a television near the window of the living room, indicating which room in the house was in use by the occupants.

heat sources = indoor lights for growing marijuana.

From the facts actually in the record of this case, this much is clear: existing thermal imagers such as the AN–PAS–18 Stinger distinguish and visualize fine gradations of heat, and law enforcement officers are interpreting those gradations ·in a fashion that leads to physical searches of homes.

One of the justifications for prewarrant use of thermal imagers is the "garbage exception" to the warrant requirement, premised on the concept of "waste heat." Several, but not all, of the courts approving the use of thermal imagers analogize heat escaping from a building to garbage left for pickup. This is inapt for several reasons.

As pointed out by the cases cited in Section II.B., it is illogical to conclude that any homeowner gives the same thought to the escape of heat from his or her home as he or she does to the removal of garbage from the home. Taking out the trash is a conscious act that affirmatively demonstrates an abandonment of the contents of the trash can. Loss of heat from a home occurs, for the most part, without any conscious decision by the homeowner to relinquish it.

Indeed, except in a case where other facts tend to show an actual choice by a home owner to throw away heat, it is more logical to assume that the *opposite* is the case. Homeowners in Wisconsin don't vent heat in February, they guard against its escape with high "R" insulation, double-paned windows, storm doors, caulking, and various other weather-proofing techniques.[8]

Looking specifically to this case, the record does not reflect the temperature in Polk County at 2:00 a.m. on February 6, 1994, but according to Wisconsin's 1993–94 Blue Book, the average daily temperature for the region in February is 14 degrees Fahrenheit. *Id.* at 682. There is no reason to believe that Field was throwing away heat on that day.

What about in the summer? When it's hot and humid, everyone who can afford a fan or an air conditioner intentionally throws heat out of the house. One could logically conclude that the homeowner has "abandoned" that heat. But just as trash still in the house is conceptually different from trash intentionally taken to the curb, so is heat radiating from a source still within the house different from heat intentionally vented through a machine.

Granted, a thermal imager only collects heat that has already left the house. But only heat that has left the house *via* a conduit that implies intentional relinquishment could reasonably be analogized to "trash." Other heat escapes unintentionally. So, the government could probably point its thermal imager at the back of an air conditioner or the face of an outward-venting fan, but it could not point it at any door, window, wall or roof. Perhaps it goes without saying that the government is unlikely to have much interest in creating thermal images of the back of air conditioners, but only such heat fits within the concept upon which the warrantless search is premised.

Another questionable assumption of the garbage analogy is that the homeowner has put any thought whatsoever into the use to which others are putting his or her radiated heat. As the Supreme Court noted in allowing warrantless searches of garbage, it is "common knowledge" that garbage left on the curb is "readily accessible" to animals, scavengers, snoops, and the public at large; further, the homeowner has placed the garbage on the curb for the express purpose of conveying it to a third party, who quite conceivably will sort through it or allow others to do so. *Greenwood,* 486 U.S. at 40, 108 S.Ct. at 1628.

It is hardly common knowledge that government officials cruise the public streets after dark scanning houses with thermal imagers, seeking to interpret heat patterns. In this particular case, the government had what it believed to be a reason to go to Field's house to look at it. The government's legal argument, however, is that it does not

---

8. Under the logic of some of the cases cited in Section II.A, (and the logic employed by the government in its search warrant affidavit in this case reporting the shielding of visible light), such diligent efforts to "hide" heat loss could be viewed as circumstantial evidence of an indoor marijuana grow.

need a reason to look at anyone's house with a thermal imager, because this is not a search. In fact, in this case the officers randomly scanned two houses to create a control group. What if they had found "hot spots" at the control houses? Would the government have opened drug investigations of those homeowners?

If any given homeowner were made aware of this possibility, what would his or her reaction be? Some probably could not care less; others would probably feel that nobody has the right to scan their homes with high tech equipment trying to develop evidence of crimes.[9] It is difficult to know whether any given homeowner would have a subjective privacy interest in his or her heat. So, the court's conclusion in *Greenwood* cannot be transferred wholesale into the analysis of thermal imaging.

Tied into this is the question whether society would be prepared to recognize as reasonable any such subjective expectation of privacy in one's heat. I note redundantly that it is not clear that the public is aware either of the capabilities of thermal scanners or the use to which they are being put, or could be put. I conclude that if society were aware of these things, individuals would develop subjective expectations of privacy in at least some of the heat sources in their homes, and that society would be prepared to recognize these expectations as reasonable. I further conclude that if society were aware that the detection of "hot spots" on people's homes is now being used by the government in its efforts to determine what is happening inside of the home, the public would recognize as reasonable an individual's subjective expectation of privacy as to the heat sources inside of his or her home.

Cases that allow prewarrant use of thermal imagers also analogize them to the use of dogs used to sniff drugs. The dog analogy fits better than the garbage analogy, but for the reasons noted by the court in *Ishmael*, it still comes up short. *See* 843 F.Supp. at 213.

While the record in this case is devoid of facts about drug sniffing dogs, this court is aware of no such canine capable of detecting and pinpointing the location of contraband at a constant distance of 20 meters, let alone 200 meters. Drug sniffing dogs normally work close in, and typically scratch at the drug container when "alerting." Thus, a homeowner has some protection from the random use of a drug sniffing dog: unless the homeowner invites the police onto his property (or they have some other legal right to be present), the dog must operate outside the limits of the curtilage, which typically would prevent an unconsented search.

Second, when used at an appropriate range, a properly trained drug sniffing dog is more precise than a heat imager because the dog is trained to alert only to contraband. A thermal imager visualizes all the heat it registers, regardless of the source of radiation. The operator is free to draw whatever inferences he or she wishes about the source of the heat.

In sum, I conclude that the use of a thermal imager is a search that does not fit into any exception to the warrant requirement. The government's prewarrant use of a thermal imager to analyze Field's house on February 6, 1994 was improper. Therefore, evidence derived by use of the thermal imager cannot be used to support the request for the warrant.

## II. THE SEARCH WARRANT AFFIDAVIT VIOLATES THE RULE OF *FRANKS*

Field contends that Investigator Joy intentionally misstated some material facts and omitted others. Under *Franks v. Delaware*, Field wants this court to redact the misstatements, add the omissions, and reconsider whether there is probable cause to support the warrant.

The government responds that Field has not even made the required substantial preliminary showing of any reckless or inten-

---

9. Other possible uses of thermal scanners might cause people to develop conscious expectations of privacy in their heat. What if the power company were to roam the streets looking for homes that were "wasting" energy in order to

tack a surcharge onto their bills? What if burglars started casing homes with thermal imagers in an attempt to determine if the occupants were home and if so, in which room they were located?

tional material falsehoods in Joy's affidavit, and that the *Franks* analysis need not be undertaken. At the evidentiary hearing the government agreed to put Investigator Joy on the stand to testify about the disputed matters. This takes us past the question of the preliminary showing: we have had a *Franks* hearing. The question is whether Joy intentionally or recklessly made material misstatements or omissions in his search warrant affidavit.

There is at least one material misstatement in Joy's warrant application: after accurately reporting Field's monthly electricity bills, Joy stated that the manager of the electrical coop had told Joy that "the normal Barron Electric Co. customer with a residence similar to Field uses on average $80 worth of electricity a month." The manager never said this; what he told Joy was that the normal single family residence in the area used that amount of electricity. The manager had no familiarity with Field's property and had offered no opinion as what its electrical needs would have been under normal (*i.e.* non-drug growing) conditions.

It is beyond dispute that the statement is material. It provides the nexus to Joy's prior statement that in Joy's experience, an indoor marijuana grower's use of high intensity lights might be evidenced by [high] electrical consumption. Without a "control" monthly bill, there would be no basis for the judge to determine whether Field's electrical use was so abnormally high as to support the inference that he is using high intensity lamps to grow marijuana.

Next, there is no doubt that Joy knew that the statement he was reporting was not literally true. At the April suppression hearing Joy still recalled what the electrical company manager actually told him, which shows that Joy had been capable in February of accurately reporting to the issuing judge the manager's actual statement.

The critical question is whether this disposes of the issue and requires the court to redact the technically untrue statement as a black-letter violation of *Franks*, or whether the court may look further to determine whether Joy's interpretation of the manager's statement nonetheless accurately cap-

tured the substance of the manager's statement to Joy. In slightly different contexts, the case law stresses the deference that courts must show when reviewing warrants and affidavits. *See, e.g., United States v. Pless*, 982 F.2d 1118, 1184 (7th Cir.1992) (doubtful cases should be resolved by upholding the warrant); *United States v. McAllister*, 18 F.3d 1412, 1416 (7th Cir.1994) ("The Supreme Court directs that search warrant affidavits must be presumed to be valid," citing *Franks*, 438 U.S. at 171, 98 S.Ct. at 2684). The parties have argued this point very thoroughly. Therefore, it seems appropriate for the court to look beyond the literal untruthfulness of Joy's statement to see whether it accurately conveys the information provided to him.

This gets to the heart of the *Franks* opinion. As the court noted,

> It is established law ... that a warrant affidavit must set forth particular facts and circumstances underlying the existence of probable cause *so as to allow the magistrate to make an independent evaluation of the matter.*

438 U.S. at 165, 98 S.Ct. at 2681, citations omitted, emphasis added.

In arguing against any post-warrant review of an affidavit's sufficiency, the government, in *Franks*, noted that a citizen's privacy interests are adequately protected by the magistrate's independent determination of sufficiency based on the face of a sworn affidavit, coupled with the magistrate's ability to "conduct a fairly vigorous inquiry into the accuracy of the factual affidavit supporting a warrant application." 438 U.S. at 166, 98 S.Ct. at 2682. The government went so far as to argue that it would essentially insult the issuing court to review its decision after the fact; "Denigration of the magistrate's function would be imprudent insofar as his scrutiny is the last bulwark preventing any particular invasion of privacy before it happens." *Id.* at 167, 98 S.Ct. at 2682.

Recounting the arguments in favor of allowing post-warrant review in certain circumstances, the Court in *Franks* noted that sometimes mistakes will be made because of the haste in which warrants must be issued

and because the "magistrate has no acquaintance with the information that may contradict the good faith and reasonable basis of the affiant's allegations." *Id.* at 169, 98 S.Ct. at 2683. In limiting such post-warrant reviews to cases of deliberate or reckless misstatements, the court noted that this "leaves a broad field where the magistrate is the sole protection of a citizen's Fourth Amendment rights, namely, in instances where police have been merely negligent in checking or recording the facts relevant to a probable cause determination." 438 U.S. at 170, 98 S.Ct. at 2683.

In this particular case, I find no intentional decision by Investigator Joy to mislead the court by misstating some facts or omitting others. However, the evidentiary hearing has clearly revealed that Joy misstated a fact critical to probable cause, and misstated it in a conclusory fashion that prevented the court from performing its role of carefully scrutinizing the warrant in order to make an independent determination of probable cause.

In arguing that Joy's statement is misleading, Field points to facts that Joy omitted from his affidavit that were necessary for the court to make an accurate assessment as to what electrical use records showed. For instance, Field has stated, in his affidavit, that his "residence" is actually an eighty acre farm with livestock, two barns, and a chicken coop, all wired for electricity, all of which is readily visible from the public road. Joy admits having driven by Field's place numerous times, and admits having seen, in addition to the home, two sheds approximately 40′ × 50′, and a "shack."

Having observed Investigator Joy's demeanor while testifying, I believe that he was truthful in stating what he saw and what he did not see. Therefore, Field's affidavit about what else was there can only be relevant if Joy was in some way reckless in failing to observe more. "Recklessness" for *Franks* purposes is established when the evidence shows that the affiant "in fact entertained serious doubt as to the truth of his allegations." *United States v. Henry,* 933 F.2d 553, 557 (7th Cir.1991), *cert. denied,* ―― U.S. ――, 112 S.Ct. 1703, 118 L.Ed.2d 412 (1992), citations omitted. I do not find that

Joy's failure to observe more of the features of Field's premises was reckless.

So, the next question is: did Joy arrive at his conclusion about the comparability of Field's electrical bill to the average home, and his conclusion that Field's high electrical use "is consistent with past experience in indoor marijuana grows" in a reckless fashion?

In this case, the answer is yes. Joy's conclusions about Field's electricity use were not actually supported by the facts that Joy had uncovered. By presenting the court with a conclusory statement about the comparability between Field's premises and the average electricity customer, and by putting the statement into the mouth of an "expert" who had not reached the conclusion stated, Joy misled the court.

Joy personally concluded that Field's premises was comparable to a normal Barron Electrical Coop customer, and that his electrical bills were therefor inexplicably high. Would the coop's manager have reached the same conclusion if he had driven by and reviewed Field's premises with an eye attuned to power use? Unknown. Even if Joy was correct in surmising that Field's premises were not the equivalent of a large farming operation, a surmise that is debatable, there was certainly room to question whether even a "hobby farm" fit within the manager's definition of a normal coop customer. As Joy himself admitted several times on the stand, "I guess maybe I have a different opinion of a farm than some people."

In sum, there were facts known to Joy that should have caused him to doubt the accuracy of the statement he made in his affidavit. At the very least, Joy should have accurately stated the facts that he had collected and let the court draw the conclusions.

Would the state court have asked Joy to follow up on these matters if the court had known that the coop manager actually had offered no opinion about normal electrical use for Field's premises, and if it had known the size of Field's premises? Unknown. Knowing what this court knows after the fact, I conclude that the state court should have and would have required more informa-

tion before deciding whether to issue the warrant. *See, e.g., United States v. Scully,* Case No. 91–1014, 1992 WL 120430, 1992 U.S.Dist. LEXIS 9576 (N.D.Ill.1992), in which the court in a *Franks* review revised a search warrant affidavit to reflect accurate electricity consumption information: "courts must not permit agents, however well-intentioned to report less than the total story to manipulate the inference that the magistrate will draw." *Id.,* at \*7, 1992 U.S.Dist. LEXIS 9576, at \*18–19. There, the court found a *Franks* violation where the agents in their affidavit stated that defendant's home used five times as much electricity as his next door neighbors when in fact the houses were not comparable: the defendant's house was half again larger and had an outdoor swimming pool. *Id.,* at \*6, 1992 U.S.Dist. LEXIS 9576, at \*15.

Therefore, I conclude that this statement must be redacted from the search warrant affidavit:

> Mr. Peterson states that the normal Barron Electric Co. customer with a residence similar to Field uses on average $80 worth of electricity a month.

The following omitted facts (written in the first person) must be added to the affidavit:

> Mr. Peterson states that the normal Barron Electric Co. customer owning a single family dwelling uses on average $80 worth of electricity a month.
>
> Mr. Peterson states that a large livestock, farming or milking operation would use more electricity.
>
> Mr. Peterson is not familiar with the Field residence.
>
> I have personally observed the Field residence. There I have seen a house, two pole sheds approximately 40' × 50', a detached garage, and at least one other building.

The final question is whether the affidavit, in light of my findings in Sections II and III, still supplies probable cause.

## III. THE REMAINING FACTS DO NOT PROVIDE PROBABLE CAUSE

At this juncture, everyone knows that Field really was growing marijuana indoors, just as Investigator Joy and his colleagues suspected. But as the Court stated in *Maryland v. Garrison,* 480 U.S. 79, 107 S.Ct. 1013, 94 L.Ed.2d 72 (1987), "The discovery of contraband cannot validate a warrant invalid when issued. . . . The validity of the warrant must be assessed on the basis of the information that the officers disclosed, or had a duty to discover and disclose, to the issuing magistrate." *Id.* at 85, 107 S.Ct. at 1017.

This court must review the state court's determination that probable cause existed for the issuance of the warrant under the deferential "clear error" standard. *United States v. Pless,* 982 F.2d at 1124, *citing United States v. Spears,* 965 F.2d 262, 270 (7th Cir. 1992) *cert. denied,* —— U.S. ——, 113 S.Ct. 502, 121 L.Ed.2d 438 (1992). A reviewing court will reverse such a determination only when it is left with the "definite and firm conviction that a mistake has been committed." *United States v. Fryer,* 974 F.2d 813, 818 (7th Cir.1992). Even doubtful cases are to be resolved in favor of upholding the warrant. *Pless,* 982 F.2d at 1124, citation omitted.

Probable cause is a very low evidentiary threshold:

> Probable cause requires more than bare suspicion but need not be based on evidence sufficient to support a conviction, nor even a showing that the officer's belief is more likely true than false . . . The relevant inquiry is not whether specific conduct is innocent or guilty, but the level of suspicion attaching to particular kinds of noncriminal acts.

*United States v. Burrell,* 963 F.2d 976, 986 (7th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 357, 121 L.Ed.2d 270 (1992).

Direct evidence is not necessary to a probable cause determination. *United States v. Malin,* 908 F.2d 163, 165 (7th Cir.1990), *cert. denied,* 498 U.S. 991, 111 S.Ct. 534, 112 L.Ed.2d 544 (1990). In determining whether probable cause exists to issue a warrant, a judge

> need not determine that the evidence sought is *in fact* on the premises to be searched or that the evidence is more likely than not to be found where the search takes place. He need only conclude that it would be reasonable to seek the evidence

in the place indicated in the affidavit. In reaching his conclusion, a judge is entitled to draw reasonable inferences about where evidence is likely to be kept, based on the nature of the evidence and the type of offense.

*Id.,* at 166 (citations omitted; emphasis supplied).

As stated by the Supreme Court in *Illinois v. Gates,* 462 U.S. 213, 238, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983),

[t]he task of the issuing [judge] is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and the "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.

Similarly, it would not be proper for this court to second guess the issuing court by taking various specific pieces of evidence in isolation and explaining them away; both Investigator Joy, as the affiant, and the issuing court were allowed to use their training and experience to view the conduct set forth in the affidavit as a whole. *See United States v. Scott,* 19 F.3d 1238, 1242 (7th Cir. 1994).

The final, and perhaps most important case that influences the probable cause analysis is *United States v. Leon,* 468 U.S. 897, 926, 104 S.Ct. 3405, 3422, 82 L.Ed.2d 677 (1984). In creating the good faith exception to the requirement of a valid warrant, the Court held in *Leon,* that

In a doubtful or marginal case a search under a warrant may be sustainable where without one it would fall.

\* \* \* \* \* \*

We have ... concluded that the preference for warrants is most appropriately effectuated by according great deference to a magistrate's determination. Deference to the magistrate, however, is not boundless.

\* \* \* \* \* \*

Reviewing courts will not defer to a warrant based on an affidavit that does not provide the magistrate with a substantial basis for determining the existence of probable cause. Sufficient information must be presented to the magistrate to allow that official to determine probable cause; his action cannot be a mere ratification of the bare conclusions of others. Even if the warrant application was supported by more than a "bare bones" affidavit, a reviewing court may properly conclude that, notwithstanding the deference that magistrates deserve, the warrant was invalid because the magistrate's probable-cause determination reflected an improper analysis of the totality of the circumstances....

468 U.S. at 914–15, 104 S.Ct. at 3416–17 (quotations and citations omitted).

Field, naturally, contends that Joy's affidavit is "bare bones" and that the issuing court was misled into approving it. The government, naturally, contends that warrant is sustainable on its merits, given the deferential review to which the warrant is entitled.

Based on the conclusions I reached in Sections I and II above, the evidence left in the warrant amounts essentially to this:

in March 1992 an unnamed citizen informant told another officer that Field had handguns in the house, that Field supposedly had $5000 cash, and the house had a very heavy odor of marijuana.

A named informant told Joy that around Christmas 1993 he saw blush colored lights glowing through the uncurtained front windows of Field's house; the color of the lights was something the informant had seen before over growing plants.

Joy's training and experience show that indoor marijuana growers use grow lights which are quite bright. Marijuana growers block out windows to hide this light.

At 3:00 a.m. on [February] 6, 1994, officers saw no lights on in Field's house; however night vision glasses revealed "large amounts" of light coming from around windows and doors in the Southeast portion of the building. The officers surmised that shielding material had been placed around the windows to block light.

Electrical consumption records can possibly show the use of grow lights because

such lights consume large amounts of electricity.

According to the electric company, a normal single family dwelling in that service area consumes about $80 of electricity a month. A large livestock or farming operation would use more.

The electric company is not familiar with Field's premises and has made no analysis of his use of electricity.

Field's premises include a house, two pole sheds approximately 40' × 50', a detached garage, and at least one other building. Field's electricity bills for the past year show that Field consistently uses about $185 per month in electricity, year round, with a low of $165 in February 1993 to a high of $232.60 in January 1994.

Field's electricity use is somewhat similar to known marijuana grows that Joy has previously investigated.

As noted above, the question at this juncture is not whether this court would issue this warrant; the question is whether it was clearly erroneous for the state court to conclude on this evidence that evidence of a marijuana growing operation would be found at Field's residence. Since the affidavit has been redacted and edited by this court in its review, this court must attempt to discern whether it would have been reasonable for the state court to draw this conclusion on the affidavit as it now exists. I conclude that it would not.

Starting at the beginning, the information from the unnamed informant had little evidentiary value in March of 1994. First, there is no basis to judge the credibility of this informant. Investigator Joy provides no track record or other information that would allow the court to conclude that the informant should be believed. In *United States v. Fairchild*, 940 F.2d 261, 265 (7th Cir.1991) the court held that an affidavit's bald assertion that the informant was "credible and reliable" was insufficient, by itself, to establish probable cause; nonetheless, because the informant was not anonymous, spoke from first hand knowledge, provided specific and detailed information, and was corroborated by the seizure of drugs from the defendant the day before in another warrant, the court

found that there was probable cause. *Id.* at 265.

In *United States v. Skinner*, 972 F.2d 171, 174–75 (7th Cir.1992), the court, in applying the *Leon* good faith test, noted that in *Gates* the Supreme Court had held that an informant's explicit and detailed first-hand account of alleged wrong-doing entitled the CI's tip to greater weight than might otherwise be the case. The affidavit found insufficient in the *Skinner* case was fourteen pages long, and included a three-page anonymous letter from a CI detailing a marijuana smuggling operation with an organizational flow chart, and also included a narrative of the DEA's efforts to corroborate the letter's contents. 972 F.2d at 172–73.

In *United States v. Granger*, 596 F.Supp. 665, 669 (W.D.Wis.1984), this court held that "information supplied by a confidential informant cannot establish probable cause for a warrant unless there is some indication that the information is reliable." There, because the CI was an anonymous inmate, the court found that, in the absence of any corroboration, his statement was "inherently unreliable." *Id.*

Here, there is simply a two year old statement from an unnamed citizen. There is no indication, one way or the other, as to why the state court should believe the information. For instance, the informant does not indicate how he knew what marijuana smelled like; he did not even indicate whether he smelled marijuana smoke or marijuana plants. *See, e.g., United States v. DeLeon*, 979 F.2d 761, 765 (9th Cir.1992) (persons qualified to know an odor that is distinctive may offer an opinion, but "a warrant cannot be based on the claim of an untrained or inexperienced person to have smelled growing plants which have no commonly recognized odor.")

Then there is the age of the informant's information. Two year old information is stale. True, "where the affidavit recites facts indicating ongoing, continuous criminal activity, the passage of time becomes less critical." *United States v. Lamon*, 930 F.2d 1183, 1188 (7th Cir.1991) (quoting *United States v. Shomo*, 786 F.2d 981, 984 (10th

Cir.1986)). But in *Lamon,* the challenge was to information 72 hours old. *Lamon* notes with approval that at least one court has recognized that probable cause may be found "several weeks, if not months" after the last reported instance of suspected drug activity. *Id.,* citation omitted. *See also United States v. Pless,* 982 F.2d, at 1125–26 in which the court was willing to give credence to three month old specific inculpatory information about drug dealing from an informant where the search warrant affidavit also reported specific inculpatory information from two other informants relating to current activity.

In Field's case, the information was over one hundred weeks old. It was not very specific, and the more current information, while subject to interpretation as inculpatory (see below) was not nearly as specific or incriminatory as the supporting information in *Lamon* or *Pless.* This does not mean that the information provided by the informant must be discarded; however, its weight is minimal. Two year old information about the smell of marijuana and the presence of handguns and cash at the farm verges on being a nullity for probable cause purposes.

Next, the information provided by the banker must be given appropriate weight. The banker had seen blush colored lights over plants on previous occasions; therefore, apparently, he surmised that that is what he saw. Interestingly, Investigator Joy, in describing high-powered grow lights stated that they are "very bright;" he did not state the color of their light, but I do not infer that it is "blush colored." Joy was qualified to offer an expert opinion on what the citizen saw, yet he did not do so. The citizen informant is not an expert, and his observation must be weighed accordingly.

Also noteworthy is that the citizen stated that he saw the light through an uncurtained window; elsewhere in the affidavit Joy indicated that marijuana growers block their windows, and stated that there were indications that Field had done so here. Indeed, trained law enforcement officers saw light only with the assistance of night-vision glasses. This is at odds with the implication of the banker's information: that Field had marijuana grow lights running near an unshaded window through which passing motorists could view them.

I also note that Joy does not tie the location of the window viewed by the citizen to the location of either the "hot spot" or the "leaking light;" were they the same or not? If they were the same, this undermines the implication raised by the night-vision observations, that Field had intentionally blocked his windows so that no one could see the light; if they were different, then the information provided by the citizen has little inculpatory value since a blush colored glow through unshaded windows at Christmas time in a location other than that believed to be the location of the grow lights means nothing. This consideration, joined with the others, tends to minimize the inculpatory weight of the information.

Next is the information obtained by the night-vision goggles. The information is entitled to some weight, but not much, because there is no foundation for the observations. How much light is a "large amount" when one is looking through night-vision goggles? Would the light from a television or a reading lamp qualify?[10] Aren't curtains and drapes "shielding materials"? There is no indication that Joy, in any of his daytime drive-bys down the same road, saw any shielding material affixed to any windows. February 5, 1994 was a Saturday and February 6, 1994 was a Sunday. Do some people stay up late on the weekends with the lights on and the shades pulled?

In hindsight, it appears that the all of the information interpreted as indicating that the marijuana grow was occurring in the house, namely the blush colored Christmas time lights and the information gathered during the March 6, 3:00 a.m. mission, was incorrect. The plants were found in one of the pole sheds, not in the house. There is no indication that the plants were moved in the inter-

**10.** If the thermal imager's "hot spot" were still in the affidavit, it would be subject to the same scrutiny: couldn't it just be a television or a reading lamp near the wall? Apparently it could, since Capt. Russell would not, after the fact, rule out a household dehumidifier as the possible source of the hot spot.

vening two days. There is no indication that officers discovered blocked-out windows in the house, although they did find evidence of what Joy believed was a "drying room."

Despite the benefit of hindsight, the question at this juncture is: based on what the officers knew and stated in their affidavit, did probable cause for the requested search exist on March 8, 1994? As noted in the gloss of the law above, the government does not have to eliminate every innocent explanation for the evidence it has collected, and it is entitled to have the court consider all of the evidence in its totality. But the court does not abandon its neutral and detached role when weighing pieces of evidence to which the government attaches criminal significance.

The facts so far do not show much support for the government's pre-search belief that Field was operating an indoor marijuana growing operation.

Next comes the electricity information. Perhaps there was some fertile ground to be plowed here, but in his haste to obtain the warrant Investigator Joy left it untilled. When presented in a factually accurate manner, the search warrant affidavit provided no nexus between "normal" electrical use and Field's allegedly "considerable" use. There was no legitimate basis for a comparison.

Joy could have had the coop manager perform the analysis that Joy mistakenly stated in his affidavit had been performed. That would have had some weight, coming from an expert in electricity use. Joy could have checked use by the previous owner of Field's property to see if there was a jump during Field's residency. *See, e.g., United States v. Olson, supra,* 21 F.3d at 848–49, in which agents looked at several years' use, found the suspect's to be three to four times as high as the previous tenant, and had two managers of the electrical company offer opinions specifically about the property: the power usage was something non-weather related with a constant draw, that was also high for a single person with no apparent agricultural operation. *Id.*

In this case, Joy did not have sufficient information to support the inference that he asked the court to draw. *See United States v. Scully, supra,* 1992 WL 120430, 1992 U.S. Dist. LEXIS 9576 (court grants motion to suppress based on agents' omissions from the search warrant, including faulty electrical usage comparison); *See also United States v. Cummings,* Case No. 1:93–CR–78, 1994 U.S. Dist. LEXIS 2159 (W.D.Mich.1994), in which the court granted a motion to suppress for lack of evidence to support the search warrant, finding that electrical use twice as high as expected was not particularly compelling.

Finally, Joy's opinion that Field's use of electricity was "somewhat similar" to past proven marijuana grows doesn't add much. As the cases cited above indicate, indoor marijuana growers often have high electrical bills. Therefore, anyone who has a high electrical bill is somewhat similar to an indoor marijuana grower. Absent some more specific observation within his special expertise, Joy has not provided any information that would support a finding of probable cause. Finally, the adjective "somewhat" implies at least the possibility that Field's electrical use was somewhat dissimilar from other marijuana growing operations Joy had uncovered. If this is so, then it should have been included in the affidavit for the court to consider.

Mindful of the deference to which the issued warrant is due, when I add up the evidence and consider it in its totality rather than in pieces, I am left with the firm and definite conclusion that a mistake has been committed. I conclude that the search warrant affidavit does not contain sufficient probable cause to support the conclusion that evidence of an indoor marijuana growing operation would be found at Field's residence. The evidence did not provide a basis for the judge reasonably to believe that evidence of an indoor marijuana growing operation would be found at Field's residence.

For completeness's sake I make two more observations: First, even including the evidence provided by the thermal imager would not have saved the warrant. Existence of one "hot spot" on a wall, consistent with home appliance use, proves nothing. Second, while a warrant for "premises" normally includes all of the buildings included thereon, Joy's affidavit provided no basis, even in a

boiler-plate paragraph, to believe that evidence would be found in the pole sheds. What evidence there was pointed to the house.[11] Given my other conclusions, there is no need to explore these matters further.

## IV. THE GOOD FAITH EXCEPTION DOES NOT SAVE THIS WARRANT

The last remaining question is whether the search remains valid under the good faith exception of *United States v. Leon*, 468 U.S. 897, 926, 104 S.Ct. 3405, 3422, 82 L.Ed.2d 677 (1984). The issuing court's duty as envisioned by the Court in *Leon* is set forth in Section III, above. The Court went on to hold that evidence should not be excluded when an officer obtains it in "objectively reasonable reliance on a subsequently invalidated search warrant." 468 U.S. at 922, 104 S.Ct. at 3420. The Court continued:

> Nevertheless, the officer's reliance on the magistrate's probable-cause determination and on the technical sufficiency of the warrant he issues must be objectively reasonable, and it is clear that in some circumstances the officer will have no reasonable grounds for believing that the warrant was properly issued.
>
> \* \* \* \* \* \*
>
> Nor would an officer manifest objective good faith in relying on warrant based on an affidavit 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.'
>
> \* \* \* \* \* \*
>
> Depending on the circumstances of the particular case, a warrant may be so facially deficient—i.e., in failing to particularize the place to be searched or the things to be seized—that the executing officers cannot reasonable presume it to be valid.

468 U.S. at 922–23, 104 S.Ct. at 3420–21, citations and internal quotes omitted.

> In the absence of an allegation that the magistrate abandoned his detached and neutral role, suppression is appropriate only if the officers were dishonest or reckless in preparing their affidavit or could not have harbored an objectively reasonable belief in the existence of probable cause.

468 U.S. at 926, 104 S.Ct. at 3422. *See also United States v. Skinner*, 972 F.2d 171, 175 (7th Cir.1992).

Good faith does not save this warrant. Setting aside momentarily my recommendation regarding the thermal imager, what prevents a finding of objectively reasonable reliance on the warrant is my finding that Joy, however innocently, included in his affidavit a statement that was incorrect and misleading. The electrical use comparison, incorrectly put in the mouth of the coop manager, gave improper weight to the strongest piece of evidence in the affidavit. Joy knew, or should have known, that he had misstated the facts.

Additionally, although the parties haven't really argued it, it appears that the affidavit oversells the findings of the thermal imager. Capt. Russell testified that he found one "hot spot" which he did not interpret in any fashion, except to note that it was higher in temperature than the surrounding wall areas. The affidavit reports the finding of "abnormal" hot spots, in the plural. Maybe that is what was reported to Joy, but it was incorrect.

Finally, whatever Joy believed about the existence of a marijuana grow operation at Field's house, the evidence as stated in the warrant affidavit did not provide an objectively reasonable basis for believing that such an operation was present. I surmise that there were a lot of foundational and background facts that Joy knew that he could have put into his affidavit to beef up the sparse facts contained therein. But these statements are, for the most part, lacking. *See Lamon*, 930 F.2d at 1189 ("Although conclusory statements without more do not provide a substantial basis for finding probable cause, issuing magistrates are entitled to take into account the experience of officers

---

11. This is true even for the evidence of "high" electrical use, since Joy did not know that the pole sheds were wired for electricity. If Joy *did* know that the pole sheds were wired, then his conclusion in his affidavit that Field's premises were comparable to a single family dwelling was knowingly false.

whose affidavits explain the significance of specific types of information.") (footnote and citation omitted).

Given the misstatements in the affidavit, the weakness of the inferences of criminal acts created by the additional evidence, and the failure to provide foundational facts that would strengthen the inferences, I conclude that it was not objectively reasonable for the officers to rely on the warrant that they obtained from the state court.

## CONCLUSION

Michael Field had marijuana growing in a pole shed behind his house in Polk County. Investigator Joy knew this, or at least strongly suspected this, and undertook a by-the-book investigation of Field. The evidence gathered during that investigation was weak, but appeared to confirm Joy's suspicions. Joy took his evidence to the circuit court and obtained a warrant. The subsequent search found the drugs. The government brought the case to federal court. Field complained that his rights were violated by the government's actions. If he prevails, then this case will likely disappear, and Field will go free.

I noted at the outset that this was a close case. As my perhaps prolix analysis indicates, I have found a constitutional violation in this case. This court takes no pleasure in short circuiting a drug prosecution at the outset.

But Michael Field is presumed innocent. If his Fourth Amendment rights were in fact violated, then the government cannot be allowed to use the illegally seized evidence to convince a jury otherwise. That's what the exclusionary rule is all about. What some might view as legal technicalities, others, including this court, view as inviolable Constitutional rights. This court's duty is to protect the Constitution, regardless of where the chips fall. Without assessing blame, casting aspersions, or second guessing the officers, I find that Michael Field's Fourth Amendment rights were violated, and I make my recommendation accordingly.

## RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1)(B), I respectfully RECOMMEND that this court:

1) DENY defendant Michael Field's motion to identify the informant;

2) DENY defendant Michael Field's motion to compel disclosure of sentencing guideline information; and

3) GRANT defendant Michael Field's motion to suppress evidence.

Entered this 6th day of May, 1994.